RANDY S. GROSSMAN
United States Attorney
NICHOLAS W. PILCHAK
California State Bar No. 331711
Assistant U.S. Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: Nicholas.Pilchak@usdoj.gov

Attorneys for the Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI (1),<br>SHEIDA ALAN (2),<br>   aka Sheida Arabi,<br>SANJIV TANEJA (3),<br>ALI AKBAR SHOKOUHI (4)<br><br>Defendants. | Case No.:  22-CR-1152-BAS<br><br>**THE UNITED STATES' *EX PARTE* APPLICATION FOR A POST-INDICTMENT RESTRAINING ORDER**<br><br>[Under Seal]<br><br>**The Honorable Cynthia Bashant** |

The United States of America, by and through United States Attorney Randy S. Grossman, and Assistant United States Attorney Nicholas W. Pilchak, hereby files this *ex parte* application under 28 U.S.C. §2461(c), which incorporates 21 U.S.C. § 853(e) and 853(l), for entry of a post-indictment restraining order to secure, maintain, and preserve the availability for forfeiture real property located at 1520 Vinson Creek Road, West Vancouver, British Columbia, Canada (008-505-152) (the "Subject Real Property").

## I

## BACKGROUND

Defendants Karim Arabi ("Karim") and Sheida Alan, aka Sheida Arabi ("Sheida"), are charged in a sealed Superseding Indictment with wire fraud conspiracy, wire fraud, and

conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 1349, 1343, and 1956(h).  ECF 9; *see also* ECF 1.   Generally, the Superseding Indictment alleges that Karim and Sheida conspired with each other and others to sell to Qualcomm intellectual property that Qualcomm legally (but unknowingly) owned pursuant to its employment contracts with then-employee Karim.  The co-conspirators deliberately concealed from Qualcomm Karim's role in the creation of the intellectual property and the technology startup company that Qualcomm ultimately purchased to acquire the subject intellectual property for $150 million (USD).

The Superseding Indictment includes forfeiture allegations.  Of particular relevance to this Application, paragraph 31 of the Superseding Indictment charges:

> Upon conviction of the offense in violation of Title 18, United States Code, Section 1956(h) as set forth in Count 6 defendants KARIM ARABI ("KARIM") and SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA") shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1) all property involved in the offense.  The property to be forfeited includes, but is not limited to: real property located at 1520 Vinson Creek Road, West Vancouver, British Columbia, Canada.

The United States submits that the affidavit of FBI Special Agent Terrence Mycka, attached hereto as Exhibit 1, provides probable cause that the Subject Real Property was purchased with the proceeds of the fraud scheme and as part of the subsequent money laundering conspiracy involving Karim and Sheida.

Because the Subject Real Property constitutes proceeds of the fraud scheme and is property involved in the money laundering conspiracy, it is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and subject to restraint pursuant to 21 U.S.C. § 853(e)(1)(A).

## II

## ANALYSIS

**A.    The Court has Authority to Issue Post-Indictment Restraining Orders.**

Here, the Superseding Indictment alleges that Karim and Sheida shall forfeit to the

United States all property, real and personal, which constitutes or is derived from the proceeds of wire fraud and wire fraud conspiracy, as well as all property involved in the offense of conspiring to launder monetary instruments pursuant to the provisions of 18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c). ECF No. 9 at ¶¶ 29–31. "Any property, real or personal, involved in a transaction or attempted transaction in violation of [Title 18, United States Code,] section 1956, 1957, or 1960 [], or any property traceable to such property" is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(A). Additionally, property that constitutes proceeds of a wire fraud offense or a conspiracy to commit such offense is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which provides:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

18 U.S.C. § 981(a)(1)(C). A specified unlawful activity under 18 U.S.C. § 1956(c)(7), in turn, includes any act or activity constituting an offense listed in 18 U.S.C. § 1961(1), which includes wire fraud in violation of 18 U.S.C. § 1343. 18 U.S.C. §§ 1956(c)(7), 1961(1).

As is relevant here, "proceeds" is defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).

Pursuant to 28 U.S.C. § 2461(c), the United States may seek criminal forfeiture of a defendant's interest in assets subject to civil forfeiture if the defendant is "charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," and the United States includes a forfeiture allegation "in the indictment or information pursuant to the Federal Rules of Criminal Procedure." 28 U.S.C. § 2461(c); Fed. R. Crim. P. 32.2. "The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture

proceeding . . . ." 28 U.S.C. § 2461(c).

The provision governing the issuance of restraining orders to preserve property following the filing of an indictment provides:

> (1) Upon application of the United States, the court may enter a restraining order or injunction . . . or take any other action to preserve the availability of [any property subject to forfeiture]--

> (A) upon the filing of an indictment or information charging a violation . . . [for which forfeiture may be ordered] and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section.

21 U.S.C. § 853(e)(1)(A). The Court has authority to issue such orders without regard to the property's location. 21 U.S.C. § 853(l).

The Court can issue such a pre-trial restraining order against any property subject to forfeiture under the applicable forfeiture statute upon a finding of probable cause that the property constitutes or is derived from proceeds traceable to a violation of a charged offense for which forfeiture is authorized. *See United States v. Monsanto,* 491 U.S. 600, 615-16 (1989) ("Indeed, it would be odd to conclude that the Government may not restrain property, such as the home and apartment in respondent's possession, based on a finding of probable cause, when we have held that (under appropriate circumstances), the Government may restrain *persons* where there is a finding of probable cause to believe that the accused has committed a serious offense."). That is, if the United States may forfeit assets as a consequence of conviction, then upon a showing of probable cause the United States may obtain "an order barring a defendant from frustrating that end by dissipating his assets prior to trial." *Monsanto*, 491 U.S. at 616.

As set forth herein, there is probable cause to believe that the Subject Real Property constitutes or is derived from proceeds of wire fraud and wire fraud conspiracy, and was involved in the charged conspiracy to launder monetary instruments.

4

**B.     The Subject Real Property Constitutes the Proceeds of Fraud and Was Involved in the Offense of Conspiracy to Launder Monetary Instruments.**

The Superseding Indictment establishes probable cause to believe that:  (1) Karim, Sheida, and their co-conspirators defrauded Qualcomm out of $150 million (USD); (2) as a result of the fraud, Qualcomm paid $91.8 million (USD) via a wire transfer to Sheida's account at Canadian Imperial Bank of Commerce (CIBC) on or about October 30, 2015; (3) less than three months later, Sheida's CIBC account was closed after the entire balance was transferred to another CIBC account in her name; (4) Sheida formed a Canadian real estate investment company to conceal and distribute the proceeds of the wire fraud by investing them in valuable real estate in British Columbia; and (5) Sheida, in apparent consultation with Karim, purchased multiple parcels of Canadian real estate worth tens of millions of Canadian dollars.

As is more fully set forth in the Affidavit, there is probable cause to believe that the Subject Real Property was purchased with the fraud proceeds, and that it was purchased as part of the money laundering conspiracy.  Generally:

- Before receiving $91.8 million (USD) from Qualcomm in October 2015, there is no evidence that Sheida had the financial wherewithal to purchase millions of dollars of real estate.  To the contrary, the available evidence suggests that she was a graduate student at a Canadian university making approximately $14,000 (Can) per year from a stipend.  *See* supporting Affidavit at ¶¶ 38–40.

- After receiving the $91.8 million in fraud proceeds, Sheida purchased (either in her name or in the name of an entity she controlled) at least five real properties in West Vancouver, including the Subject Real Property.  Aff. ¶¶ 41–42.

- The five properties were purchased between April 2016 and November 2016, and the sale prices ranged from $3.9 million and $6.5 million (CAD).  Aff. ¶ 42.

- Four of the five properties were sold between December 2020 and December 2021.  Teranova North Development Inc., an entity Sheida controls, remains the owner of the Subject Real Property, which was purchased in November 2016 at

a sale price of $6,125.000.  Aff. ¶ 42, 52–53.

- Karim emailed Sheida in December 2019 attaching a spreadsheet listing ten different real properties (including a property on the street matching the Subject Real Property's address), writing "This is based on what we discussed."  The email, which was exchanged during the time that Karim and Sheida were making over $45 million (USD) of repayments to Qualcomm as part of their settlement in a civil fraud suit, describes Sheida as owning the Subject Real Property through Teranova North Development Inc., which is an entity registered to Sheida in British Columbia. Aff. ¶¶ 43–44.

- Between June 2020 and December 2021, Sheida sold four of the five Canadian properties that she had evidently purchased with fraud proceeds.  The timing of some of the purchases strongly suggests that the sales were accomplished to repay Qualcomm as part of Karim and Sheida's settlement with the company from its civil fraud suit, which in turn shows that the properties were almost certainly purchased with fraud proceeds.  Aff. ¶¶ 46–50.

## C.    The Restraining Order Sought by the United States Serves the Interests Underlying 21 U.S.C. § 853(e)(1)(A).

The interests to be considered in fashioning a protective order are evident in the statutory language: "to preserve the availability of property . . . for forfeiture."  21 U.S.C. § 853(e)(1).  Upon the conclusion of the criminal action, or the filing of a final order of forfeiture, if the United States prevails, the Subject Real Property will be forfeited pursuant to 18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c), as property constituting or derived from proceeds traceable to conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h).  As the Supreme Court has made clear, the purpose of the provision authorizing protective orders is to ensure that the commands of the substantive forfeiture provision are carried out—that is, that the property remains fully available at the end of the case.  *United States v. Monsanto*, 491 U.S. 600, 612-613 (1989); *see United States v. Hopkins*, 920 F.3d 690, 695 (10th Cir. 2019) (explaining that the Supreme Court's judgment in *Luis v. United*

*States*, 136 S. Ct. 1083, 1087 (2016), does not implicate the pretrial restraint of "tainted" property).

Here, the restraining order sought by the United States serves these interests by prohibiting—except with permission of the Court—the sale or transfer of the Subject Real Property, thereby preserving the real property for forfeiture upon the issuance of a Final Order of Forfeiture. At this point in time, prior to the entry of Final Order of Forfeiture, the United States does not seek to dispossess Karim or Sheida of the Subject Real Property but merely to restrain them in order to ensure its availability to satisfy a Final Order of Forfeiture as to the Subject Real Property.

**D.     The Court Has Authority to Issue This Order *Ex Parte*.**

The statutory scheme permits the United States to apply for the requested relief *ex parte*. Specifically, Section 853(e)(1) requires notice to persons with an interest in the property and an opportunity for a hearing only when a restraining order is sought "*prior to* the filing of . . . an indictment or information." 21 U.S.C. § 853(e)(1)(B). No such language requiring notice and opportunity for a hearing exists for application for a restraining order "upon the filing of an indictment or information" charging the requisite offenses and alleging forfeiture. *Compare* 21 U.S.C. § 853(e)(1)(A). Consequently, the Court's authority to issue Section 853(e) restraining orders *ex parte* is established by the statutory scheme itself. *See*, *e.g.*, *United States v. Roth*, 912 F.2d 1131, 1132 (9th Cir. 1990).

The United States makes application *ex parte* in this case because all defendants charged in the sealed Superseding Indictment—including Karim and Sheida—are presently the subject of sealed arrest warrants. If Karim and Sheida were notified that they were subject to arrest and prosecution, there is a substantial chance that they would flee. Both Sheida and Karim have roots and possible family connections in Iran, and email records suggest that Sheida likely wired millions of dollars of fraud proceeds to Iran, indicating further ties that may enable her to resettle there. Aff. ¶¶ 34–35, 57. The United States does not have an extradition treaty with Iran.

7

Moreover, if Karim and Sheida were notified of the criminal investigation, and specifically the pursuit of the Subject Real Property for forfeiture, there is reason to believe that Karim and Sheida would dissipate or encumber the property before it could be preserved for forfeiture.  For example, the very nature of the underlying fraud scheme, in which over $91 million of fraud proceeds was transferred outside of the United States, suggests an intent to evade U.S. authorities and conceal criminal proceeds abroad.

As set out in the accompanying Affidavit, agents plan to execute a combined search and arrest operation on or about August 9, 2022.  Aff. ¶ 8.   On or about that date, the United States plans to request that Canadian law enforcement assist in executing the Court's order by application of Canadian legal process to restrain the Subject Real Property.  The United States will also attempt to serve notice of the instant restraining order upon counsel for Karim and Sheida on or about August 9, 2022.

**III**

**RELIEF REQUESTED**

The United States respectfully requests that this Court enter a restraining order pursuant to 28 U.S.C. § 2461(c), which incorporates 21 U.S.C. § 853(e) and 853(l), and specifically under 21 U.S.C. § 853(e)(1)(A), restraining, prohibiting, and enjoining Defendant Karim Arabi and Defendant Sheida Alan, aka Sheida Arabi; their agents, servants, employees, attorneys, family members and those persons in active concert or participation with them; and those persons, financial institutions, or entities who have any interest or control over the Subject Real Property, and all persons having actual knowledge of this Order, from attempting or completing any action that would affect the availability, marketability, or value of the property—including but not limited to selling, assigning, pledging, distributing, encumbering, wasting, secreting, or otherwise disposing of or removing from the jurisdiction of this Court all or any part of their interest, direct or indirect, in the Subject Real Property.  The United States expressly requests that the Order specify that such persons shall not:

a) damage, devalue, alienate, dissipate, transfer, sell, assign, lease, pledge,

encumber, or dispose of the Subject Real Property or fixtures within, in any manner, directly or indirectly;

b) cause the Subject Real Property or fixtures within to be damaged, devalued, alienated, dissipated, transferred, sold, assigned, leased, pledged, encumbered, or disposed of in any manner;

c) take, or cause to be taken, any action which could have the effect of concealing or removing the Subject Real Property from the jurisdiction of this Court, or damaging, depreciating, or diminishing the value of, the Subject Real Property; or

d) engage in any illegal activity with the Subject Real Property or knowingly allow any illegal activity to occur with the Subject Real Property during the pendency of this criminal forfeiture action.

The United States further requests that the requested Order be entered under seal, with the limited exception of permitting the United States to share the order with authorities—including Canadian government authorities—required to assist with its execution.

The United States further requests that the requested restraining Order remain in full force and effect until further order of this Court.

DATED: August 1, 2022

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

NICHOLAS W. PILCHAK
Assistant U.S. Attorney

**AFFIDAVIT**

I, Terrence Mycka, being duly sworn, hereby depose and state as follows:

**TRAINING AND EXPERIENCE**

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI).  I have been employed by the FBI since January 2015.  I am currently assigned to the San Diego field office on the Health Care Fraud squad, which investigates health care fraud and related matters.  Previously, I was a Management and Program Analyst for the FBI for approximately 7 years.

2.     In the course of my employment as a Special Agent with the FBI, I received 20 weeks of training for new agents at the FBI's academy in Quantico, which included training on interview and interrogation techniques, arrest procedures, obtaining and executing search and seizure warrants, and investigation of a wide range of federal offenses. Specifically, I received formal training in conducting investigations involving healthcare fraud, mail and wire fraud, and false claims offenses. I also have attended numerous additional trainings on detecting and preventing white collar fraud. I have personally participated in the execution of search and seizure warrants, and investigated numerous cases of healthcare fraud, mail fraud, and false claims offenses.

3.     The facts set forth in this Affidavit are based on my personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and bank records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. In particular, I have coordinated with agents and personnel from the FBI, the United States Marshals Service (USMS), and the Internal Revenue Service Criminal Investigation (IRS-CI) who are participating in the investigation outlined herein.  All the dates, times, and amounts listed in this affidavit are approximate. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application to restrain the property listed

below, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## PURPOSE OF AFFIDAVIT

4.      This affidavit is made in support of an application for an order to restrain real property purchased with fraud proceeds as part of a money laundering conspiracy, specifically: the real property located at 1520 Vinson Creek Road, West Vancouver, British Columbia, Canada (008-505-152) (the "**Subject Real Property**").

5.      Based on the evidence outlined in this affidavit, I submit that there is probable cause to believe that the **Subject Real Property** is forfeitable to the United States, because it constitutes proceeds of the fraud scheme as well as property involved in the money laundering conspiracy.  More specifically, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to a wire fraud offense, or a conspiracy to commit such offense is forfeitable to the United States. Further, pursuant to Title 18, United States Code, Section 981(a)(1)(A) and 982(a)(1), all property, real or personal, involved in the offense of Title 18, United States Code, Section 1956(a)(1), (Laundering of Monetary Instruments) and 1957, (Unlawful Monetary Transaction) is forfeitable.

6.      According to bank records, email evidence, real property records, and other evidence recovered as part of this investigation, as well as conversations with other law enforcement agents, there is probable cause to believe the **Subject Real Property** constitutes proceeds of the fraud scheme as well as property involved in the money laundering conspiracy, both in violation of Title 18, United States Code, Sections 1343 and 1349 (wire fraud and wire fraud conspiracy) and 1956(h) (money laundering conspiracy).

## BACKGROUND

7.      Defendant KARIM ARABI ("KARIM") was an engineer working in the technology industry and specializing in the "Design for Test" (or "DFT") field of the

2

microchip sector. Defendant KARIM was employed by Qualcomm as a Vice President of Engineering from 2007 to 2012 and as a Vice President of Research and Development from 2013 to 2016.  As a Qualcomm employee, defendant KARIM signed and was bound by agreements generally providing that intellectual property he created during his period of employment would belong to Qualcomm.

8. Defendant SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA") was KARIM's younger sister, residing in Vancouver, British Columbia, Canada.  From 2014 to 2016, defendant SHEIDA pursued a master's degree at Simon Fraser University ("SFU") in British Columbia, Canada, where she studied under a professor (Bozena Kaminska) to whom defendant KARIM had introduced her.  According to SFU records, defendant SHEIDA's studies related to subjects generally relevant to inkjet printing and not to the DFT field.

9. On May 24, 2022, a federal grand jury in the Southern District of California returned a sealed indictment charging Karim, Sheida, Sanjiv Taneja, and Akbar Shokouhi with a wire fraud conspiracy and related offenses in case number 22-cr-1152-W.  Karim and Sheida specifically were charged with engaging in a wire fraud conspiracy (in violation of 18 U.S.C. §1349), a single count of wire fraud (18 U.S.C. § 1343), and engaging in a money laundering conspiracy (18 U.S.C. §1956(h)).[1]  On July 19, 2022, the grand jury returned a sealed superseding indictment containing the same charges, as well as additional allegations concerning the money laundering conspiracy and pertaining to forfeiture.

## OVERVIEW OF THE SCHEME

10. In October 2015, Qualcomm Technologies, Inc. ("Qualcomm")[2] paid approximately $150 million to acquire Abreezio LLC ("Abreezio"), a newly-formed

---

[1] Agents presently plan to conduct a combined search and arrest operation on or about August 9, 2022 to execute the arrest warrants against the charged defendants.  In Sheida's case, this will require coordination with foreign authorities in Canada.

[2] Qualcomm is a multinational technology company with corporate headquarters in San Diego, California, per public source records. Qualcomm creates intellectual property,

Silicon Valley technology startup.  According to court documents from Qualcomm's subsequent civil fraud suit,[3] Abreezio claimed to hold the rights to innovative Design-For-Test ("DFT") microchip technologies, including products known as Qbreez, TruSens and TruTest.[4]  In its discussions with Qualcomm, Abreezio, led by CEO Sanjiv Taneja and CTO Brad Quinton, was careful to claim that its core technologies had been developed by Sheida Alan (née Sheida Arabi) ("Sheida")—a graduate student at Simon Fraser University ("SFU") in British Columbia, Canada.

11.   Unbeknownst to Qualcomm, however, Abreezio's valuable technology was not originally developed by Sheida, but rather her brother Karim, who was then a Vice President of Engineering at Qualcomm.  As a Qualcomm employee, Karim was explicitly barred by agreements with his employer from owning or profiting from technologies he developed which related to Qualcomm's business while working for the company.  Per the terms of Karim's own agreements with Qualcomm, any such technology he developed belonged to his employer, and so in order to conceal the true origin of Abreezio's $150 million intellectual property, Abreezio and its principals made a blizzard of false representations and withheld material information from Qualcomm during its acquisition.

12.   Among other things, Abreezio and its principals (notably Taneja) falsely and repeatedly represented to Qualcomm that Sheida was the true inventor of Abreezio's technology, and fraudulently withheld the material information that (1) Sheida was in fact

---

semiconductors, software, and services related to wireless technology. Among other intellectual property, it owns patents critical to the CDMA2000, TD-SCDMA, and WCDMA mobile communications standards.

[3]   According to court filings, in October 2017, Qualcomm filed a civil complaint alleging fraud and conspiracy in San Diego Superior Court against Karim Arabi, Sheida Alan aka Sheida Arabi, and Sanjiv Taneja ("the Civil Fraud Suit").  *See* ¶ 47 below. Qualcomm provided documents from the Civil Fraud Suit to investigators, including discovery that Taneja, Quinton, Karim, and Sheida had produced to Qualcomm.

[4]   The DFT field is a highly technical field that aims to reduce the time and expense in testing microchips.

Karim Arabi's sister; (2) Karim was heavily involved in the formation of Abreezio, including choosing the name of the company and hand-selecting its CEO; and (3) Karim prepared and submitted the original provisional patent applications for the DFT technologies while he was employed at Qualcomm.

13.     As part of its purchase of Abreezio, Qualcomm wired almost $92 million USD to Sheida in Canada.  Thereafter, distributing, dispersing, and concealing the fraud proceeds, Sheida invested in a series of multi-million dollar properties in British Columbia, sometimes through a real estate holding entity; made a $4 million low- or no-interest loan to Karim's U.S. company; wired roughly $12 million to another Arabi brother in Norway; liquidated certain properties to fund civil settlement repayments to Qualcomm, in consultation with Karim; and began sending millions of dollars back to Karim and Karim's company in the United States after closing out a settlement of the Civil Fraud Suit.  These transfers to Karim are almost certain to constitute Sheida's remaining fraud proceeds and may be ongoing.

## EVIDENCE OF SCHEME TO DEFRAUD

14.     In Karim's June 15, 2011 Qualcomm-sponsored EB-1 visa application,[5] he described himself as one of the world's foremost experts in the DFT field.  The letters in support of his visa application demonstrate his leadership and expertise.  Two of the letters were from colleagues with whom Karim would work on Abreezio: Brad Quinton[6] and

---

[5]     EB-1 visas are reserved for researchers or scholars who can demonstrate that they are an outstanding researcher of international recognition.

[6]     Quinton is the co-founder and CEO of Invionics, Inc.—the Canadian tech company that refined Abreezio's technology before its sale to Qualcomm.  Abreezio described Quinton as its co-founder and Chief Technology Officer.  Qualcomm employed Quinton from Abreezio's purchase in November 2015 to May 2018, according to its records.

Bozena Kaminska.[7]  Kaminska's letter explained that she has known Karim since May 2000, when they worked together with Quinton at a company named PMC-Sierra.

15.   Qualcomm re-hired Karim in April 2013, according to its personnel records, as a Vice President of Engineering in the Corporate Research and Development Department.  As a Qualcomm employee, Karim's employment agreements expressly prohibited him from owning technologies he developed if they related to Qualcomm's business. Additionally, Karim's agreements bound him to disclose any inventions, avoid conflicts of interest, and adhere to Qualcomm's business conduct code, which prevented self-dealing.

16.   By October 2014, Karim was planning with Brad Quinton to use "a currently dormant" third company as to hold IP rights to new DFT technology. In an October 20, 2014 email, Quinton described making Karim (or perhaps one of his family members) a significant shareholder in this new company.  In exchange for the ownership share, Karim would continue to provide his technical expertise in further developing his new DFT technology.  According to Quinton, this third company would develop Karim's technology and create marketing materials for use with "large semiconductor companies like QCOM"—i.e., Qualcomm.

17.   On November 25, 2014, Karim emailed Quinton to discuss the new company's business partnership structure and ownership shares, suggesting that Quinton might become the new company's CEO and estimated the company would be worth $50 million.  In December 2014, Karim continued to correspond with Quinton about their project to refine and eventually sell Karim's new technology.  Quinton sent an email on

---

[7]   Kaminska received a Ph.D. from Warsaw University of Technology in Poland, developed her own business in Portland, Oregon and was named Innovator of the Year in 1997, per her public biographical materials.  Since 2004, Kaminska has been a Professor and Canada Research Chair Tier 1 at SFU, supervising Sheida during her master's program, and was recruited by Karim for Abreezio's board of directors.  Patent applications filed for Abreezio's DFT technology list Kaminska as a co-inventor.  Kaminska previously lived in Vancouver, but she currently lives in Montreal.

December 1, 2014 to a number of Invionics employees inviting them to a meeting with Karim to discuss Karim's new technology, which Quinton acknowledged was Karim's "idea/patent application." The email made no mention of Sheida.

18. On December 2, 2014, Quinton emailed Karim about the corporate structure of the new company, writing: "We should also think about the appearance of control from an investor/acquirer due diligence point of view," and "A[n] independent investor, with [] even a small i[n]vestment, who could take a board role, would be very helpful from this point of view." Days later, on December 8, 2014, Quinton emailed Karim to discuss the desirability of having "someone [Karim] can trust" to sit on the board of the new company, specifying that he did not want someone related to Karim. Karim responded the next day, suggesting Bozena Kaminska for the board spot. Karim pointed out that Kaminska was "not active in this area"—i.e., in DFT technologies—but did note that Kaminska supervised Karim's sister in her graduate studies at SFU, adding "I am not sure if this is positive or negative." Karim added that Kaminska had past experience in DFT, and remarked that he was thinking of talking to Kaminska and changing his sister's thesis work to focus on the new company's field. Quinton responded that "I would be careful about having your sister work on [the new company's project] at SFU" because SFU might try to assert IP rights in her work, identifying precisely the concern that would animate the entire project: keeping the new technology's provenance pristine so it could be sold for maximum value.

**A.  Karim Submits Provisional Patent Application for New DFT Technology Listing Sheida as the Inventor.**

19. In December 2014, Karim submitted the provisional patent application for the core technology that would form the heart of Abreezio and its value proposition. Although the patent application lists Sheida as the inventor and contact, emails and internet protocol connection records show that Karim actually prepared the application and directed its submission.

20.     Specifically, on December 15, 2014, Karim emailed Sheida and requested that she let him know if she received any email about a provisional patent application, which he had submitted relating to the new DFT technology.  Sheida replied to Karim a few hours later at 9:09 a.m.: "I got it…." She forwarded an invoice to Karim from "Thoughts to Paper"[8] via DocuSign, copying Phil Wilson from Thoughts to Paper.

21.     According to Thoughts to Paper's records from the Civil Fraud Suit, the "Info Sheet" for the DFT technology was submitted by Karim on December 15, 2014 from his main personal email (karim_arabi@hotmail.com) listing his sister, Sheida, as the sole inventor and main contact.  It indicated that her address was in Burnaby, British Columbia, Canada.  On the "Info Sheet," Karim provided two email addresses for Sheida: Karim's personal email (karim_arabi@hotmail.com) and "arabisheida@gmail.com." The "Info Sheet" also listed a telephone number for "Sheida"—a San Diego-area phone number (858-900-7830) that Karim admitted in verified civil discovery responses was one of his telephone numbers. The "Info Sheet" also lists the IP address from which the provisional patent application was submitted: 76.167.224.63.   Publicly available internet search services indicate that the IP address is currently assigned in San Diego, California.

22.     Wilson at Thoughts to Paper emailed Sheida (copying Karim) on December 17, 2014, asking her to review the final documents and indicating that the provisional patent application was ready to be filed.  A few hours later, however, Karim replied to this email at, writing only to Sheida, instructing her to "Please send an email to [Wilson] about the progress of your provisional patent application."  Shortly after Karim emailed his sister, Google records indicate that Karim created a brand new email account in his sister's name: sheida.arabi1@gmail.com.     Specifically, IP logs for

---

[8]     Thoughts to Paper is a U.S. company that provides services in the patent application process for a fixed fee, according to its website. These services include the creation of the provisional patent application, review by a patent attorney or agent, and filing of the provisional application with the United States Patent and Trademark Office.

"sheida.arabi1@gmail.com" show that it was created from the same San Diego-based IP address (76.167.224.63) that Karim had used to submit the provisional patent application just days earlier.[9]

23. Emails from the real Sheida (at "arabisheida@gmail.com") demonstrate Sheida's ineptitude. On December 18, 2014, Sheida responded to her brother's email directing her to email Wilson about the provisional application's progress. In the message, Sheida wrote: "What I need to send ??? I don not [sic] have any idea." Sheida added that it would be better for her brother to communicate with her using her SFU email account ("sarabi@sfu.ca"), "because I check it more regularly."

24. On December 22, 2014, as reflected in an Electronic Acknowledgement Receipt form, a provisional patent application for the DFT technology was submitted to the U.S. Patent and Trademark Office (USPTO). The application listed Sheida Arabi as the inventor, applicant, and filer. The email account provided to the USPTO was the dummy email account ("sheida.arabi1@gmail.com") that Karim had created days earlier to impersonate his sister.

25. Twenty minutes after filing the provisional application with USPTO, Karim emailed Wilson (from Karim's Hotmail account), copying Sheida (at "arabisheida@gmail.com"), signing the message "Sheida Arabi." Karim wrote: "I would like to cancel this application. Please do not submit to USPO [sic] and refund our fees to

---

[9] The subscriber info for this account does list one of Sheida's phone numbers as the recovery SMS number, but it has no recovery email address. In discovery responses in the Civil Fraud Suit, Karim admitted that he drafted and sent one or more emails from the account between December 18, 2014 and October 30, 2015. Comparison with other records also confirms that Karim used this email account. For example, on March 10, 2015, Taneja emailed "sheida@abreezio.com" a draft note to Quinton for review. Two minutes after sending the email, Taneja texted Karim "Please check inbox – thanks." Karim replied several hours later "Have not received it." Taneja forwarded the same email to the dummy account (sheida.arabi1@gmail.com) and texted Karim "resent/thanks." Karim responded six minutes later: "Got it." The same minute, the dummy account replied with comments to Taneja's email. The same sequence (Taneja emails "Sheida," then texts Karim to "check inbox") happened again on March 19, 2015.

the credit card. I did not hear from you despite the promise of executing the application within 2 days.  This was timing sensitive application [sic] and I just filled [sic] the application using another service."

26.   The next day, on December 23, 2014, Sheida forwarded an email to Karim from DocuSign on behalf of Thoughts to Paper.  The forwarded DocuSign email referenced Wilson's email address and instructed "Please review and sign the documents required for your provisional patent application" and contained another secure link for document review and signing.  Sheida's forwarding email to Karim read: "I got this email today. Please let me know what I should do."   Karim replied the same day, writing "Why it says [sic] reminder in the title of the email? Did you get this email before? Please reply to them with the following: 'I do not wish to proceed with the following due to unexpected delays. Please refund me for all fees charged to the same credit card.'"

27.   On December 28, 2014, a second provisional patent application related to the DFT technology was submitted to the USPTO.  The cover sheet again listed the inventor as "Sheida Arabi" in Burnaby, BC, Canada, and the contact information again listed the new dummy account Karim had created under Sheida's name.

**B.    Karim, Taneja, Quinton & Shokouhi Create Abreezio.**

28.   As discussed above, in December 2014, Karim and Quinton were strategizing how to set up a new technology company to develop and market Karim's DFT technology—principally to Qualcomm.

29.   On January 7, 2015, Karim emailed Quinton to report that his sister had filed two provisional patent applications to protect the main ideas for the new technology (which Karim described as "power/performance reduction and test time/quality reduction"—i.e., DFT improvements).  Karim also claimed that his "sister would invest $19.3K" and assign her patent applications to the new entity.  Quinton replied that he believed that Karim had a "very solid vision forming for the company." Quinton told Karim that while he would like to be the CEO of the new company, he would settle for being able to "deliver[] the

technical pitch to QCOM," further confirming that both Karim and Quinton envisioned monetizing the new technology by selling it to Qualcomm as early as January 2015.

30.    In a January 21, 2015 email, Karim indicated that he was close to finalizing a deal with Taneja to serve as the new company's CEO, and referenced installing Quinton as its CTO.  Thereafter, numerous emails between Karim, Quinton, Taneja, Shokouhi,[10] and others establish that this key group was instrumental in forming and shaping the new company, and that Sheida was not involved.

31.    For example, in February 2015, Taneja was setting up new "abreezio.com" email accounts for the team via Google.  Taneja texted Karim to confirm that he could set up an account for Karim's sister, later adding that he assumed Karim would continue to use his Hotmail email, which was "better for O reasons"—clarifying a moment later "O – optics."  Taneja asked Karim for Sheida's current email address in order to set up the new company account.  Karim gave Taneja the dummy email account that he had created for Sheida two months earlier ("sheida.arabi1@gmail.com").  Taneja emailed the dummy account with log-in credentials for Sheida's new company email.  Later that evening, Karim texted Taneja, "Just activated the google account. It shows Verification in progress."

## C.    Karim Helps with Abreezio's Pitch to Qualcomm.

32.    On February 24, 2015, Taneja emailed Karim's former supervisor at Qualcomm (Ziad Mansour), introducing Abreezio ("an angel-funded Silicon Valley based design IP start-up") and requesting a meeting to showcase their "ground-breaking technology."   The next day, Taneja texted Karim, asking for help preparing the "'quantifiable' benefit portion of the presentation" to Qualcomm.  Specifically, Taneja asked Karim for the "numbers" for the comparable technology that Qualcomm was

---

[10]    Qualcomm paid Shokouhi's companies TechVC Investments Inc. and Business Strategic Advisors LLC a total of $24 million as part of the Abreezio sale.  Ongoing financial analysis shows that both companies then transferred millions of dollars to Shokouhi himself.

currently using, so that the Abreezio team would know "the 'threshold' we need to cross at Qcom" and would "help us calibrate our positioning going in." In sum, Taneja was asking for the details of Qualcomm's existing technology so that Abreezio's marketing materials could position its new technology as a meaningful improvement.[11]

33.     Taneja met with Mansour to pitch Qualcomm on Abreezio on March 20, 2015. Taneja texted Karim as soon as it was over: "Very good meeting; Ziad [Mansour] just left. Said 'this was great.'" Later that evening, Taneja texted Karim again: "Karim, Hope you are able to find quality time to enjoy the new year with family and friends. Thanks again to your technical prowess 'genius,' creative innovation and guidance, we made [a] great impression yesterday!" Karim responded, "Thanks Sanjiv! I am quite proud of my sister and what she has accomplished."

**D.     Sheida's New Resumé.**

34.     On October 14, 2015, Qualcomm requested a summary of Sheida's education and work experience, as part of its due diligence. "Sheida" emailed her purported CV to Taneja from a new dummy email account ("sheida.alan@gmail.com"). That account had recently been created on September 19, 2015 from the same San Diego IP address that had created the first dummy account, and filed the original provisional patent application papers referenced above.[12] In January 2014, Sheida supplied a different resumé to SFU when she

---

[11]     Whatever information Karim provided Taneja, it seems to have been accurate. A June 15, 2015 internal Qualcomm email following up on a June 2, 2015 meeting with Abreezio pressed on Abreezio's claims about the performance comparison between its technology and Qualcomm's. Mansour answered the questioner: "I am not sure how they know so much about [Qualcomm's existing] technology. Having said that, their assessment is very close to our assessment. As such, their claims are pretty accurate. They know their stuff."

[12]     Google's subscriber records for this account show that it is held in the name "Sheida Alan" but list no recovery SMS or email account, meaning that anyone locking themselves out of the account risked being locked out permanently. In response to requests in the Civil Fraud Suit to admit that he created this account and drafted and sent emails from it, Karim responded that he "does not recall whether or not he assisted his sister Sheida Alan" in

applied for a teaching assistant position.  Comparing the two resumés reveals a host of striking differences.  For example, Sheida's SFU resumé lists her name as "Sheida Arabi" instead of the "Sheida Alan" that appeared on the Qualcomm version.[13]

35.     More substantively, Sheida's SFU resumé omitted an entire section that comprised over three years of her most recent work experience in the version sent to Qualcomm.  Whereas the Qualcomm resumé claimed that Sheida had worked from May 2011 to November 2014 as a "Principal Technologist and Independent Entrepreneur" focused on "low power design technologies" and "innovative design for test solutions"— i.e., precisely the field relevant to the DFT technology that she claimed to invent and then transfer to Abreezio—this entry appeared nowhere on the SFU resumé.  Similarly, while Sheida's Qualcomm resumé claimed that she worked for almost a year as a "Systems Engineer" at Adigy Canada in Vancouver (from September 2010 to May 2011), Sheida's SFU resumé listed nothing of the sort.  In fact, Sheida's SFU resumé had a gap of almost three years—from July 2010, when Sheida claimed that she was an intern at an Iranian company, to April 2013, when she became an intern at the Vancouver English Center's IT department—when Sheida's real resumé listed no work or academic experience at all.

---

creating the account or drafting and sending any emails from it.  Sheida's response was the same: she did not recall whether she created the account or was assisted in doing so by Karim.

[13]     Records from British Columbia indicate that Sheida legally changed her name from "Sheida Arabi" to "Sheida Alan" on or about July 15, 2015.  Indeed, in December 2015, Karim had to remind his sister that she needed to adopt the name "Sheida Alan" for her academic work. On December 16, 2015, Sheida emailed Karim from her SFU email address (sarabi@sfu.ca) writing, "Attached file is a description of my research area and it will be put on the Ciber website. It would be great if you could check it for me and let me know if I need to edit it. Best, S." Karim responded, "Hi Sheida, Here is the text with some modifications," followed by a description including, "Sheida **Alan** is pursuing her Master's degree in Engineering Science at Simon Fraser since 2014 under Dr. Bozena Kaminska['s] supervision. Her area of research is development of a novel additive technique to manufacture nano-optical devices using inkjet printing on nanostructured surfaces...."

13

36.     Sheida's academic credentials were also remarkably different in the SFU resumé.  Whereas Sheida's Qualcomm resumé claimed that her studies at SFU included "nanoelectronics; design for security; low power design; design and test of micro-devices, micro-systems and micro-networks," her SFU resumé omitted her fields of study at SFU altogether.  And whereas Sheida's Qualcomm resumé had claimed a 4-year undergraduate degree at Urmia College (obtained between July 2000 and July 2004), Sheida's SFU resumé listed a 2-year associates degree obtained between February 2002 and July 2004, when in reality she earned a B.A.Sc. at Kermanshah Jihad University from September 2007 to February 2010, as shown in her SFU admission records.[14]

## FINANCIAL INVESTIGATION AND EVIDENCE OF MONEY LAUNDERING

### A.     Qualcomm Buys Abreezio for $150 Million.

37.     On October 30, 2015, Qualcomm and Abreezio signed a Unit Purchase Agreement (UPA), finalizing Qualcomm's acquisition of Abreezio and its DFT technology for approximately $150 million, plus anticipated future holdback payments that would have brought the total to approximately $180 million.  In the UPA, all parties (including Taneja and Sheida) represented that they had made no intentional misrepresentations in connection with the patent applications; that Abreezio knew of "no facts, information, or circumstances" that would render Abreezio's IP unenforceable; and that Abreezio had not misrepresented or failed to disclose any facts in any application that would constitute fraud or an intentional misrepresentation with respect to such an application.  Abreezio also represented that it was the sole and exclusive owner of its technologies (QBreez and

---

[14]     Sheida attached another copy of Sheida's SFU resumé to a March 30, 2016 email chain in which shes sought a teaching assistant position at SFU.  Sheida's cover email for this solicitation simply said that she: (i) was "really good at programming including: C/C++, Matlab, Visual Basic, Java;" (ii) "trained as a 4D labs's users [sic];" and (iii) was "really good at electronics and computer hardware architectures."  In a follow-up email, Sheida apologized for sending a resumé under the name "Sheida Arabi" and pointed out that her "family name is now Alan."

TruSens), and that it had truthfully disclosed everyone involved in the "conception, reduction to practice, creation, derivation, development, or making of" its IP.

38.    To consummate the purchase, Qualcomm sent several wire transactions to the relevant Abreezio principals and related companies.  Specifically, on or about October 30, 2015, Qualcomm wired payments in the following amounts to the listed individuals, among others:

| *Recipient* | *Wire Amount* |
|---|---|
| Sheida Alan | $91,854,370.93 |
| Invionics Inc. (Quinton) | $19,313,006.28 |
| TechVC Investments Inc. (Shokouhi) | $14,352,245.46 |
| Sanjiv Taneja | $10,046,571.82 |
| Business Strategic Advisors LLC (Shokouhi) | $10,046,571.82 |
| Behrooz Abdi | $1,434,967.03 |
| Bozena Kaminska | $287,034.61 |

## B.    Sheida Becomes a Real Estate Mogul.

39.    According to bank records, Sheida opened an account at Canadian Imperial Bank of Commerce (CIBC) on August 21, 2015 ending in '3899 in the name "Sheida Alan."  At this time, Sheida was an SFU grad student receiving a funding package paying her $14,000 (Canadian) a year, per SFU's records.  Files from SFU's financial support office show that Sheida applied for financial support from the university.

40.    Sheida's advisor Professor Bozena Kaminska summarized Sheida's work history in a June 2014 letter from Sheida's SFU records: she has "worked in Vancouver as an intern in IT English center from April 2013."  Sheida's true resumé, described above, listed her most recent prior employment before the English center as an intern at Keshto Sanaat Corporation in Mahabad, Iran from February 2010 to July 2010.  Taking this

evidence together, it appears that prior to Qualcomm's transfer of $91.8 million (USD) to her CIBC account, Sheida's means were limited.

41.     On or about October 30, 2015, Qualcomm wired $91.8 million USD into Sheida's new CIBC account (ending in '3899) to consummate the Abreezio purchase. Prior to the wire from Qualcomm, this account had a zero balance.  Over the next several weeks, Sheida's '3899 account posted just two withdrawals (totaling $68,000 USD).  Then, on January 13, 2016, the account was entirely depleted with a $91.8 million wire transfer to a different CIBC account held by Sheida (ending in '3134).  Sheida's new '3899 account was closed the same day—less than five months after it was opened, and less than two and a half months after receiving the $91.8m wire from Qualcomm.[15]

42.     In discovery responses in the Civil Fraud Suit, Sheida stated that between 2014 and 2016, she owned an interest in three properties in West Vancouver, British Columbia either personally or through a trust[16] and held interests in various private entities.[17]  It appears that Sheida omitted at least two properties that she purchased through one of the private entities she admitted to owning in discovery responses (Teranova North Development Inc.).  British Columbia registry information for Teranova confirms that it was incorporated July 11, 2016 and its sole listed director is Sheida, who is also identified as the company's president and secretary.

---

[15]     Bank records for the '3134 account are pending a request to Canada.  Email evidence strongly suggests that Sheida paid about $27 million in Canadian income taxes on the Abreezio money, although official tax records from Canada are still pending.

[16]     Specifically, Sheida identified the properties as 1421 Chartwell Drive; 645 King Georges Way; and 3196 Mathers Avenue.

[17]     Sheida identified the private entities as Avante North Ventures, Inc.; Avante (1420 Chartwell) LLP; Avante (3196 Mathers) LLP; Avante – Bata (3365 Thompson) LLP; Avante – Bata (645 King Georges) LLP; Avante – Bata (1520 Vinson) LLP; 1082435 BC Ltd.; and Teranova North Development Inc.  Tellingly, the names of the entities appear to track the addresses of real property owned by Sheida.

43.     Separately, open-source information confirms that Sheida or her entity (Teranova) purchased the following five parcels on the indicated dates, including the **Subject Real Property**, and later sold four of them—all except the **Subject Real Property**.  In sum, in the 13 months after receiving $91.8 million (USD) from Qualcomm, Sheida purchased at least five properties in West Vancouver with a combined sale price of more than $27 million (Can.).  Note that all figures below are in Canadian dollars.

| *Property Address* | *Sheida Purchase Details* | *Sheida Sale Details* |
|---|---|---|
| 1520 Vinson Creek Road **The Subject Real Property** | November 7, 2016 Sale price: $6,125,000 Mortgage: $3,990,000 Buyer: Teranova North Development Inc. (*directed by Sheida*) | N/A (Sheida still owns) |
| 1421 Chartwell Drive | April 15, 2016 Sale price: $5,400,000 Buyer: Sheida Alan | May 17, 2021 Sale price: $8,700,000 |
| 3196 Mathers Avenue | September 1, 2016 Sale price: $3,900,000 Buyer: Sheida Alan | June 30, 2020 Sale price: $3,400,000 |
| 645 King Georges Way | September 28, 2016 Sale price: $5,128,000 Buyer: Sheida Alan | December 21, 2021 Sale price: $3,350,000 |
| 1576 Errigal Place | November 30, 2016 Sale price: $6,500,000 Buyer:  Teranova North Development Inc. (*directed by Sheida*) | December 2, 2020 Sale price: $4,571,000 |

44.     Sheida's emails corroborate her ownership of these properties and indicates that Karim was involved in strategizing about their purchase and management.  For example, Karim emailed "Sheida" (at "sheida.alan@gmail.com") on December 13, 2019, writing "Hi Sheida, This is based on what we discussed.  Modify if it is not inline [sic] with the status.  Thanks, Karim[.]"  The email included a spreadsheet listing ten different

17

properties, including Chartwell Drive, King Georges Way, Vinson Creek Road, Mathers Avenue, and Clyde Avenue.   The spreadsheet included a column labeled "Sheida Ownership Under," which lists "Teranova North Development Inc." for each of the ten properties.   Another column provides descriptions of the properties, with Chartwell Drive described as a "brand new luxury residential house.  Just finished construction and ready to sell."  This email suggests that Karim and Sheida worked together to coordinate Sheida's management of the real estate portfolio purchased with the proceeds of their fraud.

45.   The spreadsheet's description of the **Subject Real Property** is "Old residential house in a high-end neighborhood purchased to build a luxury house."   Its "Status" is "Listed on the market. Negotiating an offer and if successful could close by March 2020."   The sheet describes the "Ownership Type" of the **Subject Real Property** as "Partnership"[18] and (as mentioned) lists "Sheida Ownership Under" as "Teranova North Development Inc."

**C.     Sheida Loans $4 Million to Karim at Low or No Interest.**

46.   In September 2016, Sheida also coordinated a $4 million loan from her company (Avante North Ventures, Inc.)[19] to Karim's company (Abacus Machines LLC), as admitted in discovery responses in the Civil Fraud Suit and corroborated by bank records.   Sheida further admitted in discovery responses that she capitalized Avante North at least in part with proceeds from the Abreezio sale.   According to a purported loan document produced in discovery in the Civil Fraud Suit, the terms of the loan from Sheida's

---

[18]     Although this spreadsheet seems to indicate that the property is held by an unspecified "partnership," as indicated below, British Columbia title records confirm that the Subject Real Property is owned in fee simple by Teranova.

[19]     British Columbia records confirm that Sheida is the sole listed director for Avante North Ventures, Inc.  She is also listed as the company's president and secretary.

company to Karim's company included the requirement that no interest was due and payable for five years after the date of the loan.[20]

**D.    Karim & Sheida Liquidate Some Properties to Repay Qualcomm**

47.    Per court records, Qualcomm filed the Civil Fraud Suit in October 2017 in San Diego Superior Court, alleging fraud and conspiracy arising out of the Abreezio transaction against Karim, Sheida, and Taneja.  In the lawsuit, Qualcomm alleged that Abreezio (with Sheida as its majority owner) fraudulently represented to Qualcomm that Sheida had invented Abreezio's technologies.[21]

48.    In December 2018, Karim and Sheida entered a settlement agreement with Qualcomm wherein they agreed to pay $45 million.  Emails establish that Karim coordinated with Sheida about the details of the repayments, and bank and real estate records show that Sheida almost certainly liquidated some of her real property holdings to make the required repayments—although she retained the **Subject Real Property**.

49.    According to wire records, Sheida made the following repayments to Qualcomm from her CIBC '3134 account:[22]

---

[20]    In approximately 2019, Abacus repaid roughly $1 million of the Avante loan slightly ahead of schedule, according to financial records.

[21]    In response, both Karim and Sheida filed cross-complaints against Qualcomm, alleging that Qualcomm had injured them by withholding the final payments due under the Abreezio acquisition agreement (over and above the roughly $150 million already paid out in October 2015). As part of her cross-complaint, among other things, Sheida claimed that Qualcomm couldn't have been defrauded in the Abreezio acquisition because it either possessed or had access to documents that should have alerted it to the fact that Sheida Alan's prior name was Sheida Arabi, and that it could have determined from evidence available to it that Sheida was Karim's little sister. Sheida also faulted Qualcomm for failing to contact her during the due diligence process.

[22]    The ultimate repayments from Sheida totaled over $47 million USD because of penalties triggered under the settlement agreement when certain of their progress payments were not timely, according to an addendum to the settlement agreement.

| Date | Amount |
|------|--------|
| January 4, 2019 | $15,000,000.00 USD |
| February 10, 2020 | $20,500,000.00 USD |
| June 30, 2020 | $6,800,000.00 USD |
| December 8, 2020 | $3,400,000.00 USD |
| April 1, 2021 | $1,574,178.19 USD |
| Total | $47,274,178.19 USD |

50.     Once again, Sheida apparently coordinated closely with Karim.  On June 28, 2020, for example, just two days before Sheida wired Qualcomm $6.8 million, Karim emailed Sheida "Please call me as soon as you can.  I need to know your plan about the wire transfer."  Sheida replied (from "sheida.alan@gmail.com") "I will send the wire today and I want to send 6.8."

51.     The timing of Sheida's sale of her properties suggests that she used some of the sale proceeds to help fund her repayments to Qualcomm.  For example, the Mathers Avenue property was sold on or about June 30, 2020—the same day that Sheida wired $6.8 million to Qualcomm from her CIBC bank account.  Similarly, the Errigal Place property was sold on or about December 2, 2020, and Sheida wired $3.4 million to Qualcomm roughly six days later.  That these properties were liquidated before or simultaneous to Sheida's repayments to Qualcomm tends to further demonstrate that the properties were originally purchased with the proceeds of the Abreezio fraud.

**E.     Sheida Funnels More Proceeds to Karim After the Settlement Concludes.**

52.     As set out above, Sheida's final repayment to Qualcomm occurred on April 1, 2021.  Just four months later, Sheida began wiring significant sums to both Karim and Karim's company, Atlazo Inc.[23]  Sheida made the transfers from her own CIBC '3134 account and from an account held in the name of her real estate company, Teranova North

---

[23]     Karim's online biography describes him as the CEO of Atlazo.  California Secretary of State records list him as the company's CEO, Secretary, and Chief Financial Officer ("CFO").

20

Development, Inc.  Specifically, Sheida appears to have sent or directed the following wire transfers (all in USD) to Karim and his company, totaling over $2.9 million thus far:[24]

| Approx. Date | From | To | Amount (USD) |
|---|---|---|---|
| July 31, 2021 | Sheida Alan CIBC '3134 | Karim Arabi Bank of America | $200,000.00 |
| August 10, 2021 | Sheida Alan CIBC '3134 | Karim Arabi Bank of America | $300,000.00 |
| Oct. 20, 2021 | Teranova North Development Inc. | Atlazo Inc. | $800,000.00 |
| Dec. 21, 2021 | Teranova North Development Inc. | Atlazo Inc. | $200,000.00 |
| January 18, 2022 | Teranova North Development Inc. | Atlazo Inc. | $300,000.00 |
| Feb. 11, 2022 | Teranova North Development Inc. | Atlazo Inc. | $100,000.00 |
| Feb. 24, 2022 | Teranova North Development Inc. | Atlazo Inc. | $149,980.00 |
| March 9, 2022 | Teranova North Development Inc. | Atlazo Inc. | $300,000.00 |
| April 22, 2022 | Teranova North Development Inc. | Atlazo Inc. | $600,000.00 |
| Total | | | $2,949,980.00 |

## F.  Details Concerning the Subject Real Property

53.    As referenced above, Sheida acquired the **Subject Real Property** on or about November 7, 2016, via Teranova North Development Inc., which appears to function as a real estate holding company that Sheida formed and has solely operated since her receipt of over $91 million USD of fraud proceeds.   Sheida has also evidently used Teranova to

---

[24]    Notably, the first two transfers from Sheida to Karim were preceded by a March 29, 2021 transfer from Karim to Sheida of $500,000.00, which suggests that all three transfers may have constituted a wash.  Moreover, the notes or wire detail field for each of those three transactions reads "loan repayment," which would be hard to reconcile with a zero-sum wash transaction.

funnel fraud proceeds back to Karim and his company (Atlazo) since concluding payments under Karim and Sheida's settlement with Qualcomm in the Civil Fraud Suit.

54.     British Columbia real estate records confirm that the **Subject Real Property** is owned (in fee simple) by Teranova, at a listed address that appears to be Sheida's personal residence, according to bank records.  Property records list the declared value of the **Subject Real Property** as $6,125,000.00 (Can), and indicate that it has a recorded mortgage lien from CIBC.

55.     Because Sheida's complete CIBC bank records (after approximately January 2016) are pending receipt from a request to Canadian authorities, my investigation has not yet been able to fully trace the source of the funds used to purchase the **Subject Real Property**.  Nevertheless, based on the facts above, I respectfully submit that there is probable cause to believe that Sheida purchased the **Subject Real Property** using fraud proceeds and as part of the money laundering conspiracy.  This conclusion is strongly supported by the fact that Sheida appeared to have extremely limited income and assets before the Abreezio purchase, whereupon she evidently received a windfall transfer of over $91 million (USD).  Only after receipt of those funds did she begin to amass a $27 million (Can) real estate portfolio.  Sheida's emails with Karim also demonstrate that she was managing this real estate portfolio, at least in part, in conjunction with him.  For example, the spreadsheet Karim emailed Sheida in December 13, 2019 listed the **Subject Real Property** along with nine other properties and discussed their "status."  Moreover, the fact that Sheida liquidated some of her properties at times when she and Karim also needed to fund $47 million (USD) of repayments to Qualcomm likewise indicates that the properties were funded with Abreezio money.

56.     Taking all of these facts together, I submit that there is probable cause to believe that Sheida purchased the **Subject Real Property** using fraud proceeds and as part of the money laundering conspiracy.  Consequently, it is subject to forfeiture.

57.    In my training and experience, once an investigation becomes overt, individuals are likely to dissipate, transfer or encumber property subject to forfeiture. I have been involved in investigations where immediately following overt investigative actions, real property that was subject to forfeiture was quit-claimed to a third party, and large mortgages were rapidly taken on the property, making the property effectively worthless for forfeiture. Likewise, I have been involved in investigations where funds were quickly drained from banks accounts prior to seizure, as funds can easily be transferred from financial accounts much faster than law enforcement is able to obtain records to trace the illicit funds. This is especially true when property is based in a foreign country, and the legal and diplomatic process for obtaining records is extremely lengthy. As a common practice, therefore, I attempt to restrain or seize any assets subject to forfeiture prior to publicly naming property, to avoid the likelihood of its dissipation or transfer.

### REQUEST FOR SEALING

58.    This is an ongoing investigation of which the targets are believed to be unaware. All targets likely have control over evidence of their involvement in the scheme to defraud Qualcomm, and their subsequent money laundering activities, including electronic evidence which is particularly easy to destroy or alter. All targets also received millions of dollars of proceeds, and maintain control over a variety of assets obtained as a result of their fraud that could be secreted or dissipated. Moreover, immigration records, financial records, and emails and other evidence all establish that both Sheida and Karim have roots and possible family connections in Iran. Email records suggest that Sheida likely wired millions of dollars of fraud proceeds to Iran, indicating further ties that may enable her to resettle there. Accordingly, there is reason to believe that premature disclosure of the existence of this application and the requested Order will result in destruction or tampering with evidence, attempts to interfere with witnesses who have cooperated with law enforcement against them, dissipation of assets, and otherwise

seriously jeopardize the success of the investigation.  Accordingly, it is requested that this application and its related materials be sealed until further order of the Court.

## CONCLUSION

59.    I submit that there is probable cause to believe that Sheida purchased the **Subject Real Property** using fraud proceeds and as part of the money laundering conspiracy.  To the extent that a portion of the **Subject Real Property** may have been acquired using funds from a legitimate source commingled with criminal proceeds, those funds are forfeitable as property "involved in" money laundering.

60.    Accordingly, I respectfully request that this Court issue an Order restraining the **Subject Real Property** to preserve its availability for later forfeiture, as set out in the application accompanying this Affidavit.


*Terrence Mycka*
Terrence Mycka
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4 on this  2nd  day of  August      2022.


*Cynthia Bashant*
Honorable Cynthia Bashant
United States District Judge