RANDY S. GROSSMAN
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
MEGHAN E. HEESCH
Minnesota Bar No. 0395912
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI (1),<br>SANJIV TANEJA (3),<br>ALI AKBAR SHOKOUHI (4),<br><br>Defendants. | Case No.: 22-cr-1152-BAS<br><br>Date: December 5, 2022<br>Time: 2:00 p.m.<br><br>Honorable Cynthia Bashant<br><br>**THE UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS ONE THROUGH FIVE AS IMPERMISSIBLY DUPLICITOUS** |

The superseding indictment charges a single conspiracy with one overarching object: to deceive Qualcomm about Abreezio's origins in order to make tens of millions of dollars. That object was not satisfied on October 30, 2015 when Qualcomm paid roughly $150 million in cash to acquire Abreezio, because the conspirators—including Sanjiv Taneja and Ali Akbar Shokouhi—had a continuing shared objective for years thereafter: to *continue to* deceive Qualcomm about Abreezio's provenance to get over $23 million of additional purchase money that the parties set aside for two years to cover

the Abreezio sellers' indemnification obligations. Thus, the final overt acts of the single charged conspiracy were not a freestanding, separate cover-up phase; they were the foreseeable and logical continuation of the parties' original agreement to defraud Qualcomm. There is therefore no duplicity in the charged conspiracy or the charged wire fraud scheme, and no basis to dismiss any of the counts in the superseding indictment. Regardless, even if Defendants *had* shown duplicity, which they have not, dismissal would not be the appropriate remedy.

Defendants' motion to dismiss for duplicity should accordingly be denied.

## I.

## STATEMENT OF THE CASE

On May 24, 2022, a federal grand jury in the Southern District of California returned an 8-count indictment charging Defendants Karim Arabi ("Karim"), Sheida Alan, aka Sheida Arabi ("Sheida"), Sanjiv Taneja, and Ali Akbar Shokouhi with wire fraud conspiracy, various related crimes, and criminal forfeiture. ECF 1. The grand jury returned a superseding indictment on July 19, 2022, adding factual allegations to Count 6 and certain allegations pertaining to criminal forfeiture. ECF 9. On August 9, 2022, Karim, Taneja and Shokouhi (collectively, the "arraigned defendants") were all arrested in the United States pursuant to arrest warrants issued in connection with the indictment. All defendants have been released on bail.

On November 21, 2022, Taneja submitted the instant Motion to Dismiss Counts One and Four for filing under seal, publicly filing a redacted version on November 29, 2022. ECF 109. Shokouhi sought to join the Motion on November 22, 2022 (publicly filing November 29, 2022), noting that in his case, it would properly apply to Counts One, Three, and Five. *See* ECF 110. On November 29, 2022, Karim sought to join Taneja's Motion, in his case, seeking to dismiss Counts One and Two. ECF 111. This Response follows.

## II.

## STATEMENT OF FACTS

### A. Abreezio's Fraudulent Formation.

In late 2014, Karim filed provisional patents for new microchip technology together with his sister, Sheida (then named Sheida Arabi).[1] Although emails show that Karim directed the filing process, the provisional patent paperwork named Sheida as the technology's sole inventor. For example, records submitted with one of the provisional patents listed "Sheida Arabi" as its supposed sole inventor and main contact but bore Karim's personal email address and telephone number as Sheida's contact information. Likewise, a provisional patent application filed December 22, 2014 identified Sheida as the purported inventor of the new listed technology, as well as the applicant and filter, but listed as Sheida's contact email a sham email account that Karim had created to impersonate his sister.

At about the same time, Karim worked closely with his unindicted former coworker to set up a new company to hold the rights to the valuable new technology. Karim and his former coworker discussed the new company's ownership structure, and how it could survive due diligence when the company was marketed to "QCOM"—Qualcomm—for tens of millions of dollars.

Karim and his former coworker carefully planned to create a third-party company because Karim then worked for Qualcomm himself and was strictly bound by employment agreements generally providing that technology he created during his period of employment would belong to Qualcomm. Instead, Karim's new company—which later became Abreezio—scrupulously avoided any reference to Karim or his role in its creation and development.

---

[1] This is a summary statement of facts for purposes of this Response, and the United States reserves the right to expand and supplement it later as necessary. Facts summarized herein are based on allegations in the superseding indictment, *see* ECF 9, except where otherwise indicated.

Karim recruited tech executive and codefendant Taneja to be Abreezio's CEO. Taneja set up new email accounts for Abreezio but wrote to Karim that Karim should continue to use his personal email because it would be better for "optics" reasons. Taneja also used sham email accounts set up to impersonate Sheida to communicate with Karim. Taneja even solicited sensitive internal information about Qualcomm's existing technologies from Karim for use in Abreezio's marketing pitches. After one such pitch, Taneja texted Karim "Thanks again to your technical prowess 'genius,' creative innovation and guidance, we made [a] great impression [at Qualcomm] yesterday!"[2]

Shokouhi was another skeleton to keep in Abreezio's closet. Although Shokouhi attended numerous Abreezio planning calls and meetings with Karim, Taneja, and others, the conspirators worked carefully to conceal Shokouhi's role in the company from Qualcomm. For instance, Shokouhi rebuffed Taneja's offer to create an Abreezio email account for a key employee of Shokouhi's separate business, Encore Semiconductor, who provided back-office financial support to Abreezio. Shokouhi pointed out that using the key employee's name would alert Qualcomm that Encore Semi was involved in Abreezio. Shokouhi was keen to hide Encore Semi's involvement because he had recently been terminated from Qualcomm for a conflict of interest stemming from Encore's dealings with Qualcomm.

**B. Abreezio's Fraudulently-Induced Acquisition.**

Based on the conspirators' deception in concealing Karim and Shokouhi's role in Abreezio, Qualcomm entered a "Unit Purchase Agreement" ("UPA") in which it agreed to buy Abreezio in two primary phases. *See* Pilchak Decl. ¶ 2.[3] First, it would

---

[2] In response, already rehearsing with Taneja how to cover their tracks, Karim wrote: "Thanks Sanjiv! I am quite proud of my sister and what she has accomplished."

[3] In the UPA itself, Abreezio and its members (including Taneja) made express representations about the company and its technology, including that it had not intentionally misrepresented any facts in applications to register its intellectual

pay roughly $150 million in cash on or about October 30, 2015. *Id.* ¶ 3. Second, Qualcomm would hold back roughly $23 million in secondary compensation to be paid to the sellers 2 years later, unless the indemnification provisions of the UPA were triggered. *Id.* ¶¶ 3, 4.

Taneja, in particular, was otherwise due to be paid $1.848 million on or about October 30, 2017 under the indemnification holdback provisions of the UPA. *Id.* ¶ 3. Shokouhi's two companies (TechVC Inc. ("TechVC") and Business Strategic Advisors LLC ("BSA")) were due to be paid a combined $4.488 million. *Id.*

But Taneja, Shokouhi, and their coconspirators would receive none of that money if Qualcomm found out that it had been deceived. Specifically, under the UPA, Abreezio (and its members, including Taneja) indemnified Qualcomm against certain losses, and Qualcomm expressly kept the holdback money as security to cover any indemnification claims. *Id.* ¶ 4. The very first subject on which Abreezio (and Taneja) indemnified Qualcomm was "against any and all losses . . . resulting from or arising out of . . . any misrepresentation . . . made by [Abreezio or its] Member[s] in this Agreement." *Id.* In short, Taneja, Shokouhi, and their coconspirators would forfeit the holdback funds if Qualcomm discovered that they had lied about Abreezio in the UPA.

**C. The Abreezio Civil Fraud Suit.**

Based on its own investigation, Qualcomm filed a civil fraud lawsuit against Karim, Sheida and Taneja in San Diego County Superior Court on October 26, 2017 (the "Civil Fraud Suit"). *Id.* ¶ 5. The suit generally alleged that they had conspired with each other to lie about Abreezio in the UPA. After filing the Civil Fraud Suit, Qualcomm did not make the indemnification holdback payments otherwise required on or about October 30, 2017, because it took the position that Abreezio had violated its obligations under the UPA by deceiving Qualcomm.

---

property. Pilchak Decl. ¶ 2. Such applications involve the disclosure of everyone involved in developing a particular technology, and none of Abreezio's applications disclosed Karim.

Impressively, Sheida *counterclaimed* against Qualcomm on January 16, 2018, alleging that it had wrongfully withheld Sheida's indemnification holdback payment, which totaled $16.896 million. *Id.* ¶ 6. Thus, the very same day that Karim caused service of falsified interrogatories lying about his role in Abreezio, Sheida was affirmatively arguing that Qualcomm was required to make another massive payment to her under the UPA that the conspirators had fraudulently induced it to enter.[4]

For his part, Taneja did not file a counterclaim, although in his January 26, 2018 settlement agreement with Qualcomm he agreed to release claims against the company for his own indemnification for litigation costs and fees and unspecified "claims against one or more Qualcomm employees." *Id.* ¶ 7. In exchange for his release and cooperation, Taneja's settlement agreement did not require him to repay Qualcomm anything from his own pocket. *See generally id.*

Although Qualcomm did not sue Shokouhi, he entered a separate settlement agreement with the company concerning the Abreezio transaction on January 27, 2020, along with his companies and another individual. *Id.* ¶ 9. In his settlement agreement, Shokouhi explicitly referenced Qualcomm's obligation under the UPA to pay the indemnification holdback funds to TechVC, BSA, and a related individual, and then released those claims as part of the settlement agreement. *Id.*

---

[4] Sheida doubled down on this position in amended counterclaims filed later in 2018, including an amended cross-complaint filed on or about June 18, 2018, in which she claimed that she was "the sole inventor of the founding Abreezio technology." Pilchak Decl. ¶ 6. In that document, she reiterated her demand for the remaining fraud proceeds from Qualcomm about four days before she and Karim caused to be produced in discovery the falsified notebook alleged in the superseding indictment. *See* ECF 9 at p. 17 para. 16(ii). Sheida maintained these claims until she and Karim settled with Qualcomm on December 6, 2018, in a settlement agreement acknowledging Sheida's cross-claims (which Qualcomm disputed), and in which the parties mutually released their outstanding claims against each other. Pilchak Decl. ¶ 8.

**III.**

**LEGAL STANDARD**

**A. Rule 12.**

A defendant may raise a defense via pretrial motion under Rule 12 only if the merits of the defense can be determined "without a trial of the general issue." Fed. R. Crim. P. 12(b)(2); *see also United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010). "However, if the pretrial motion raises factual questions associated with the validity of the defense, the district court cannot make those determinations" because "[d]oing so would invade the province of the ultimate finder of fact." *Id.*, *citing United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir.1986). None of Defendants' cited authorities support a court engaging in factfinding about single or multiple conspiracies at the Rule 12 stage.

**B. Conspiracy & Duplicity.**

Conspiracy is a continuing offense, *People of Territory of Guam v. Ignacio,* 852 F.2d 459, 461 (9th Cir.1988), and the existence of multiple conspiracies is ordinarily an issue of fact for the jury. *E.g.*, *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000). A court weighing a claim of multiple conspiracies will ask "whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy." *United States v. Moran*, 759 F.2d 777, 784 (9th Cir. 1985) (quotations omitted). "The relevant factors in determining the existence of such an 'overall agreement' are the nature of the scheme, the identity of the participants, the quality, frequency, and duration of each conspirator's transactions, and the commonality of times and goals." *United States v. Gordon*, 844 F.2d 1397, 1401 (9th Cir. 1988) (citation omitted).

The Supreme Court has held that "after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and

that the conspirators took care to cover up their crime in order to escape detection and punishment." *Grunewald v. United States*, 353 U.S. 391, 401–02 (1957).

But "[a] single conspiracy may involve subgroups or subagreements." *United States v. Tille*, 729 F.2d 615, 621 (9th Cir. 1984). In fact, the *Grunewald* Court itself carefully noted that:

> By no means does [our holding] mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Id*. at 405. Indeed, in the 65 years since *Grunewald*, courts have repeatedly found—after a careful factual analysis most always conducted after a trial—that conspiracies can include agreements to conceal criminal conduct as a part of their original agreement and in service of their primary objectives. In fact, the Supreme Court itself found as much just three years later in *Forman v. United States*. 361 U.S. 416 (1960), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978). In that case, the Court rejected a defendant's argument that his tax evasion conspiracy ended the day his final returns were filed, but continued throughout the period he concealed "holdout" income that should have been declared—"until action thereon is barred and the evasion permanently effected." 361 U.S. at 423–24; *see also United States v. Chao Fan Xu*, 706 F.3d 965, 990–91 (9th Cir. 2013), *abrogated on other grounds by RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325 (2016) (where fraudulent marriages "were part of an overall plan to steal the money and get away with it," "Defendants' immigration fraud was not a desperate attempt to cover up the bank fraud; it was part of the bank fraud scheme"); *United States v. Finlay*, 55 F.3d 1410, 1415–16 (9th Cir. 1995).

Here, while none of Defendants' authorities dismissed a charge for duplicity pretrial, he is of course correct that duplicity may raise problems of jury unanimity or double jeopardy. But even where a defendant establishes duplicity, dismissal of the duplicitous count is only appropriate where there is no lesser remedy. *See United States*

*v. Sturdivant*, 244 F.3d 71, 79 (2d Cir. 2001). Short of dismissal, before trial, courts have permitted the government to elect to go forward with only one of the distinct crimes charged in a duplicitous count. *See, e.g., United States v. Aguilar,* 756 F.2d 1418, 1422–24 (9th Cir. 1985). At trial, a duplicitous count may be cured by properly instructing the jury that they must unanimously agree upon which crime was committed. *E.g.*, *United States v. Murray*, 618 F.2d 892, 898 (2d Cir. 1980). Indeed, "[t]he entire count should not be dismissed when a less drastic ruling will suffice." *United States v. Goodman,* 285 F.2d 378 (5th Cir. 1960).

## IV.

## ARGUMENT

The superseding indictment charges a single conspiracy in pursuit of a single shared objective. As such, there is no duplicity. But even if there were, that would not justify pretrial dismissal of the counts Defendants challenge.

### A. Defendants' Motion Invades The Province Of The Jury.

At the threshold, addressing Defendants' Motion on the merits would require "a trial of the general issue"—i.e., whether the government can prove the existence of a single conspiracy—in contravention of Rule 12 and the proper function of the ultimate fact finder. "If the pretrial claim is substantially founded upon and intertwined with evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." *Shortt Acct. Corp.*, 785 F.2d at 1452 (internal citation omitted). This is precisely the case here. There is no way to assess Defendants' multiple conspiracies claim at the pretrial motions phase without extensive fact-finding on the same central issues that will be decided by the jury.

### B. The Single Charged Conspiracy.

That said, the facts set out above plainly show that the wire fraud conspiracy charged in the superseding indictment was a single scheme with a single goal. That goal continued well past Qualcomm's series of initial payment wires charged as Counts 2 through 5 and was still very much alive and well when the final two overt acts

were committed. The Court need look no further than Sheida's active January 2018 counterclaim to recover money she asserted she was still owed despite Qualcomm's filing of the Civil Fraud Suit. Acknowledging the truth—admitting to Qualcomm that it was the victim of an elaborate fraud calculated to deceive it about Abreezio's origins—would have endangered the millions of dollars otherwise due to Sheida, Taneja, and Shokouhi's companies under the UPA, and frustrated the conspiracy's original goal of getting Qualcomm's money. Hence, continuing to deceive Qualcomm during the Civil Fraud Suit was in direct service of the original objectives of the single charged conspiracy.

To be sure, Taneja may argue that he *withdrew* from the conspiracy when he settled the Civil Fraud Suit and took steps to assist Qualcomm with uncovering the truth.[5] But that would not prove that one conspiracy was terminated and another took its place; it would simply show that the conspiracy continued without Taneja's participation. And in any event, withdrawal is a defense that Taneja would have to establish at trial,[6] not a basis to dismiss counts at the pretrial phase.

Here, the facts weigh strongly in favor of finding a single conspiracy. As charged, the conspiracy consisted of an agreement to get Qualcomm's money by false pretenses. ECF 9 at 4, ¶ 14. More specifically, everyone agreed to lie about Karim's

---

[5] This argument, obviously, is inapplicable on its face to Shokouhi, who has sought to join Taneja's Motion. Shokouhi had not settled with Qualcomm at the time of the final two charged overt acts; Shokouhi did not agree to cooperate with Qualcomm or its investigation; and in fact Shokouhi's settlement agreement indicates that he believed he maintained a claim to the holdback payments under the UPA as late as January 2020, well after the final acts in furtherance of the fraud scheme. Pilchak Decl. ¶ 8. It is even less applicable to Karim, who actually perpetrated one of the final two overt acts by causing the service of false and deceptive interrogatory answers.

[6] *See United States v. Lothian*, 976 F.2d 1257, 1261 (9th Cir. 1992) ("once the defendant introduces sufficient evidence to make a prima facie case of withdrawal, the burden shifts to the government to prove beyond a reasonable doubt that the defendant did not withdraw" (citations omitted)).

involvement in Abreezio and the development of its technology, and also to conceal the role of Shokouhi and his company. They did this in order to defraud Qualcomm out of "tens of millions of dollars." *Id*.

While Defendants' Motion argues that "the objective of the alleged conspiracy as pled was achieved on October 30, 2015 . . . [and] [t]he conspiracy ended when payment was received," Mot. at 8, this is not true. The evidence, including deal documents that Taneja himself signed, shows that the object of the conspiracy included continuing to defraud Qualcomm into paying over $23 million more that it had held back under the UPA. This was the basic scheme that the defendants agreed to as part of the charged wire fraud conspiracy, and it had emphatically *not* achieved its entire object on October 30, 2015.[7]

This commonality of purpose is powerful evidence of a single agreement. All defendants had a shared interest in preventing Qualcomm from discovering the truth about their fraud—not just "to avoid detection and punishment," *Grunewald*, 353 U.S. at 405, but in primary pursuit of their original objective: to receive the proceeds of the fraud. Put bluntly, there were 23 million reasons why Karim, Sheida, Taneja, and Shokouhi (via his companies) were still invested in the conspiracy, at least as of the filing of the Civil Fraud Suit in October 2017. Under the UPA, if Qualcomm was kept never learned the truth, it would owe $23,232,000 to Sheida, Taneja, and Shokouhi's two companies. This shared objective, which after all was the original goal of the charged conspiracy, shows that the enterprise was still a going concern at the time of the final two overt acts.

---

[7] Hence, the superseding indictment pleads a time period for the charged conspiracy beginning no later than October 2014 and continuing up until at least June 2018. ECF 9 at 4, ¶ 13. As such, all defendants are amply on notice that the conspiracy did not end on October 30, 2015, but continued to at least June 2018. *Compare United States v. Aguilar*, 756 F.2d 1418, 1420 (9th Cir. 1985) ("[t]he vices of duplicity arise from breaches of the defendant's Sixth Amendment right to knowledge of the charges against him" (citation omitted)).

Defendants seek to split off what they call the coverup phase by arguing that it was unlikely that the conspirators agreed, up front, to lie during a civil suit that they may not have specifically anticipated. But the alleged scheme plainly *does* include an agreement (up front) that the coconspirators would continue to lie to Qualcomm about Abreezio and its provenance for at least two years after the UPA's effective date, simply to get the rest of the money. And in fact, the "coverup" acts that Defendants challenge were fundamentally the same kinds of fraudulent lies (that Abreezio's technology was truly developed by Sheida, and that Karim's involvement was virtually nil) told to the same fraud victim (Qualcomm) as the original lies that induced Qualcomm to enter the UPA. Simply because the lies were repeated in a slightly different arena—in the Civil Fraud Suit, rather than the original deal documents, diligence inquiries, and marketing pitches—does not transform them into a new and separate criminal agreement. And simply because the lies were disseminated by Karim or Sheida, of course, does not mean that Taneja and Shokouhi cannot be liable for them. *See Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946).[8]

Defendants have a somewhat better argument as to the timing of the final two overt acts, which they correctly note were separated by years from the other conduct in furtherance of the conspiracy. Mot. at 9–10. But this is not the dispositive fact that Defendants claim, because the two-year delay between the $150 million closing payment and the roughly $30 million holdback payments was not an unforeseen break in time that ruptured the original conspiracy. Rather, the two-year delay was precisely the period that the conspirators anticipated they would have to continue to deceive Qualcomm in order to receive the final payment of fraud proceeds envisioned by their original agreement. *Compare Grunewald*, 353 U.S. 405 ("We cannot accede to the

---

8 "[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward. It is settled that 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act.' Motive or intent may be proved by the acts or declarations of some of the conspirators in furtherance of the common objective." *Id*.

proposition that the duration of a conspiracy can be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment *after the central criminal purpose has been accomplished.*" (emphasis added)). Indeed, the two-year waiting period for holdback payments is explicitly laid out in the UPA itself, which Taneja, Sheida, and Shokouhi's companies all signed.

Defendants' also stress that there is no allegation "that the defendants anticipated and planned all along for future civil litigation" "even with the government's extensive investigative record." Mot. at 8. Yet even if there is little direct evidence of an express agreement to lie during civil litigation, a criminal conspiracy does not require an express agreement. *See* Ninth Circuit Model Criminal Jury Instruction No. 11.1 (Conspiracy—Elements) (2022 ed.) ("For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy."). The conspirators' agreement need not be explicit, and its existence can be inferred from the circumstances and the defendants' conduct. *E.g.*, *United States v. Bishop*, F.3d 910, 911 (9th Cir. 1993). Importantly, these are issues for trial.[9]

It is also elementary that conspiracy law does not require that every original coconspirator be actively participating at each moment of the conspiracy to show that there is an ongoing agreement. As noted, Taneja may seek to prove at trial that he withdrew from the conspiracy at a particular point, but this is no basis to find separate agreements and institute dismissal now.

Shokouhi's claim for duplicity is even less persuasive. While he signed a no-admission settlement agreement with Qualcomm in which he, his companies, and

---

[9] At trial, the evidence will show that Taneja planned to cover his own tracks as early as November 1, 2015, as alleged in the superseding indictment, which explicitly charges that Taneja sent a window-dressing email to one of the sham "Sheida" email accounts promising to "look [her] up" if his future travels brought him to British Columbia. ECF 9 at 16, ¶ 16(gg).

another individual agreed to pay back about 16 cents on the dollar, and he never agreed to "cooperate" with the company or discuss his role in concealing Abreezio's origins. And, as discussed above, Shokouhi evidently maintained his claim to the $4.488 million holdback money payable to his two companies as late as January 2020—well after the supposedly "separate" coverup activities that sought to maintain the fig leaf that Abreezio's technology was really invented by Karim's sister. It is manifest that Shokouhi was participating in a single conspiracy to defraud Qualcomm throughout the overt acts charged in the superseding indictment, and thus his argument for duplicity is even less well-founded than Taneja's.

Karim's claim, of course, is weakest of all. Just like Shokouhi, he had not settled with Qualcomm at the time of the final two overt acts. Much like Shokouhi and Taneja, he stood to benefit by continuing to deceive Qualcomm, in his case by facilitating its further payment of over $16 million to his sister, Sheida.[10] Worse, Karim was still actively seeking to deceive Qualcomm by repeating the same lies at the core of the conspiracy: falsely claiming that he "had no role in the formation, operation or sale of Abreezio, LLC," other than introducing Sheida to Taneja. ECF 9 at 17, ¶ 16(i). In Karim's case, the truth is clearest: the final two overt acts were not some rogue, after-the-fact coverup, but part of a seamless conspiracy to deceive Qualcomm about Abreezio to reap millions of dollars.

## C. The Proper Remedy For Defendants' Claim.

Defendants' Motion should be denied as procedurally inappropriate under Rule 12. It should also be denied on the merits because the superseding indictment charges a single conspiracy, and thus there is no duplicity and nothing to remedy. But even if there were duplicity, Defendants are not entitled to the harsh remedy of outright dismissal.

[10] By the time of the final two overt acts in January and June 2018, Karim had already received (via his own company) a $4 million loan from Sheida's company, funded by fraud proceeds. ECF 9 at 20, ¶ 24(e).

Significantly, none of Defendants' authorities hold that duplicity at the Rule 12 phase necessarily requires dismissal of the challenged count. Just the opposite: their cases concern post-conviction relief, and either imply or explicitly state that there are lesser remedies the Court could impose. *E.g.*, *Gordon*, 844 F.2d at 1401. In *Gordon*, moreover, there was a strong concern of actual jury confusion and a lack of unanimity because the indictment had explicitly charged a dual-object conspiracy, and the jury submitted a note asking whether they had to convict on both objects to return a guilty verdict on the conspiracy. *Id*. at 1401. Nevertheless, even in the *Gordon*, the court acknowledged that "curative instructions or special interrogatories" might have cured the issue and ensured a unanimous verdict. *Id*. at 1401–02.

In this case, even if the Court were concerned that the superseding indictment charges multiple conspiracies and raises a concern of potential duplicity, that concern could be adequately addressed by a special verdict form, for example, and would not require the strong medicine of dismissal.

**IV.**

## CONCLUSION

Defendants' Motion provides no basis to dismiss the challenged counts on either the facts or the law. It should be denied.

DATED: November 30, 2022

RANDY S. GROSSMAN
United States Attorney

/s/ Nicholas W. Pilchak
NICHOLAS W. PILCHAK
MEGHAN E. HEESCH
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys