**FILED**

Apr 04 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ s/ AI _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

October 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>       v.<br><br>KARIM ARABI (1),<br>SHEIDA ALAN (2),<br>  aka Sheida Arabi,<br>SANJIV TANEJA (3),<br>ALI AKBAR SHOKOUHI (4),<br>BRADLEY QUINTON (5),<br><br>                    Defendants. | Case No. <u>22CR1152-BAS</u><br><br><u>I N D I C T M E N T</u><br>**(2nd Superseding)**<br><br>Title 18, U.S.C., Sec. 1349 –<br>Wire Fraud Conspiracy; Title 18,<br>U.S.C., Sec. 1343 – Wire Fraud;<br>Title 18, U.S.C., Sec. 2 – Aiding<br>and Abetting; Title 18, U.S.C.,<br>Sec. 1956(h) – Conspiracy to<br>Launder Monetary Instruments;<br>Title 18, U.S.C., Sec. 1957 –<br>Engaging in Monetary Transactions<br>in Property Derived From Specified<br>Unlawful Activity; Title 18,<br>U.S.C., Secs. 981(a)(1)(C),<br>982(a)(2)(B), and Title 28, U.S.C.,<br>Sec. 2461(c) – Criminal Forfeiture |

The grand jury charges, at all relevant times:

**<u>Introductory Allegations</u>**

1.   Defendant KARIM ARABI ("KARIM") was an engineer working in the technology industry and specializing in the "Design for Test" (or "DFT") field of the microchip sector.  Defendant KARIM was employed by Victim Company as a Vice President of Engineering from 2007 to 2012 and as a Vice President of Research and Development from 2013 to 2016.  As a Victim Company employee, defendant KARIM was bound by agreements generally providing that intellectual property he created during his period of employment would belong to Victim Company.

NWP:nlv:San Diego:4/3/24

2.   Defendant SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA") was KARIM's younger sister, residing in Vancouver, British Columbia, Canada. From 2014 to 2016, defendant SHEIDA pursued a master's degree at University 1 in British Columbia, Canada, where she studied under a professor (Individual 1) to whom defendant KARIM had introduced her. At all times material to this indictment, defendant SHEIDA's studies related to subjects generally relevant to inkjet printing and not to the DFT field.

3.   Defendant SANJIV TANEJA ("TANEJA") was a technology executive whom defendant KARIM hand-picked to serve as Chief Executive Officer ("CEO") of Abreezio, LLC ("Abreezio").   Following Victim Company's acquisition of Abreezio, defendant TANEJA was briefly employed at Victim Company from approximately October 2015 to May 2016.

4.   Defendant ALI AKBAR SHOKOUHI ("SHOKOUHI") was an entrepreneur, investor, and business advisor.  He was employed at Victim Company as a Vice President of Engineering from approximately 2011 to 2014.  Defendant SHOKOUHI funded Abreezio's initial development through entities that defendant SHOKOUHI controlled, including Company 1 and Company 2. Defendant SHOKOUHI also arranged to provide clerical and financial services support to Abreezio through Company 1, whose staff provided financial services to Abreezio.   Defendant SHOKOUHI also controlled Company 3, which provided additional support to Abreezio during its formation and development.

5.   Defendant BRADLEY QUINTON ("QUINTON") was an electrical engineer, Chief Technology Officer ("CTO") of Abreezio, defendant KARIM's former colleague, and founder of Company 4.    Following Victim Company's acquisition of Abreezio, defendant QUINTON was briefly employed at Victim Company from approximately October 2015 to May 2018.

6.    Abreezio was a newly-formed technology startup company based in Sunnyvale, California.  Defendants KARIM, TANEJA, SHOKOUHI, QUINTON and others created Abreezio as a vehicle to commercialize new DFT technology provisionally patented by defendant KARIM while he worked for Victim Company.  Even though defendant KARIM was intimately involved in Abreezio's formation and development, defendant KARIM never disclosed his DFT technology or the patents to Victim Company, and indeed Abreezio's principals, including defendant TANEJA and defendant QUINTON, concealed defendant KARIM's connections with Abreezio from Victim Company throughout the marketing and due diligence processes leading to Abreezio's sale to Victim Company.

7.    Victim Company was a large multinational technology company based in San Diego, California.  Among other things, Victim Company specialized in microchip design, testing, and optimization, and therefore stood to benefit substantially from incremental improvements in the DFT field.

8.    Company 1 was a technology services company controlled by defendant SHOKOUHI and others, based in San Diego, California.

9.    Company 2 was a technology investment company controlled by defendant SHOKOUHI and others, based in San Diego, California.

10.    Company 3 was a technology staffing and services company controlled by defendant SHOKOUHI and others, based in San Diego, California.

11.    Company 4 was a Canadian technology services company, based in British Columbia, Canada.  Company 4 was controlled by defendant QUINTON.

12.    On October 30, 2015, Victim Company finalized a deal to purchase Abreezio and its DFT technology for over $150 million.  As part

of the purchase price, Victim Company paid over $91 million to defendant SHEIDA; over $10 million to defendant TANEJA; over $24 million combined to Company 2 and Company 3, which were controlled by defendant SHOKOUHI; and over $19 million to Company 4.

### Count 1
### Wire Fraud Conspiracy
### 18 U.S.C. § 1349
### [All Defendants]

13.   The foregoing paragraphs are hereby incorporated by reference as if fully stated herein.

14.   Beginning no later than October 2014, and continuing up to at least June 2018, within the Southern District of California, and elsewhere, defendants KARIM ARABI ("KARIM"), SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA"), SANJIV TANEJA ("TANEJA"), ALI AKBAR SHOKOUHI ("SHOKOUHI"), and BRADLEY QUINTON ("QUINTON") knowingly and intentionally conspired together and with each other and with others known and unknown to the grand jury, to commit wire fraud, that is to knowingly devise a material scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by intentional concealment and omission of material facts, and in executing said scheme, caused writings, signs, signals, and sounds to be transmitted by means of wire in interstate commerce; in violation of Title 18, United States Code, Section 1343.

15.   It was the purpose of the conspiracy that defendants KARIM, SHEIDA, TANEJA, SHOKOUHI, and QUINTON would and did fraudulently obtain tens of millions of dollars from Victim Company by selling it valuable DFT technology nominally owned by new technology start-up Abreezio, LLC

("Abreezio") while concealing from Victim Company that the technology had been provisionally patented by defendant KARIM, and originally developed by and in close association with defendant KARIM, who was then a Victim Company employee, and also to conceal from Victim Company the role of defendant SHOKOUHI and one of defendant SHOKOUHI's companies (Company 1) in Abreezio's funding and development.

16.  To execute the scheme, defendants KARIM, SHEIDA, TANEJA, SHOKOUHI, and QUINTON used the following manner and means, among others:

a.  It was a part of the conspiracy that defendant KARIM would and did file and cause to be filed provisional patents for Abreezio's core DFT technology, falsely listing defendant SHEIDA as its true inventor while concealing his own primary role;

b.  It was a further part of the conspiracy that defendant SHEIDA would and did attempt to assist defendant KARIM in the patent filing process, despite knowing that she had no real connection to the technology being patented as her supposed invention;

c.  It was a further part of the conspiracy that defendants KARIM and TANEJA would and did create, and defendant KARIM would and did use, multiple email accounts containing defendant SHEIDA's name so that defendant KARIM could impersonate defendant SHEIDA and send emails purporting to be her;

d.  It was a further part of the conspiracy that defendants TANEJA and QUINTON would and did send deceptive emails nominally to defendant SHEIDA but in truth to email accounts controlled and used by defendant KARIM, as defendants TANEJA and QUINTON well knew, to make it appear that defendant SHEIDA was an active participant in Abreezio's formation and development;

e.   It was a further part of the conspiracy that defendant KARIM would respond to these emails, signing email messages as defendant SHEIDA and occasionally forwarding documents supposedly signed by defendant SHEIDA, all in an effort to falsely portray defendant SHEIDA as an active participant in Abreezio's formation and development;

f.   It was a further part of the conspiracy that defendant KARIM would and did plan with defendant QUINTON to use a third-party holding company (later transitioned to Abreezio) as a vehicle for the intellectual property rights to defendant KARIM's new DFT technology, specifically in order to market it to Victim Company;

g.   It was a further part of the conspiracy that defendant KARIM would and did engage defendant QUINTON'S technology development company (Company 4) to further refine and monetize the DFT technology before marketing it to Victim Company, and would select defendant QUINTON to serve as Abreezio's CTO;

h.   It was a further part of the conspiracy that defendant KARIM would and did plan with defendant QUINTON to put Individual 1, defendant SHEIDA's advisor and professor at University 1, on Abreezio's board of directors to lend it credibility as a legitimate independent firm;

i.   It was a further part of the conspiracy that defendant KARIM would and did select Abreezio's business name and recruit and retain defendant TANEJA as Abreezio's CEO, while planning with defendant TANEJA to hide defendant KARIM's role in Abreezio from Victim Company and falsely portray to Victim Company that Abreezio's core technology was defendant SHEIDA's invention;

j.   It was a further part of the conspiracy that defendants TANEJA, SHOKOUHI, KARIM, QUINTON and others, would and did attend regular

operations meetings to discuss the formation and development of Abreezio without involving defendant SHEIDA in any way;

k.   It was a further part of the conspiracy that defendants TANEJA, SHOKOUHI, KARIM, and QUINTON would and did regularly refer to defendant KARIM as "Sheida" in connection with planning meetings and calls in order to mask defendant KARIM's role in the formation and development of Abreezio, and to falsely portray defendant SHEIDA as involved in that process;

l.   It was a further part of the conspiracy that defendant KARIM would and did provide defendants TANEJA and QUINTON with sensitive internal information about Victim Company's existing DFT technology, which Abreezio's DFT technology would replace or supplant, in order to fine-tune Abreezio's marketing pitch;

m.   It was a further part of the conspiracy that defendant KARIM would and did provide feedback to defendant TANEJA about Abreezio's marketing materials and about specific persons at Victim Company to contact as part of Abreezio's pitch, writing from an email account purportedly used by defendant SHEIDA and which defendant KARIM in truth used to impersonate her;

n.   It was a further part of the conspiracy that defendant SHOKOUHI would and did provide seed funding and staff support to Abreezio from other companies that defendant SHOKOUHI controlled, including Company 1, Company 2, and Company 3;

o.   It was a further part of the conspiracy that defendants SHOKOUHI, TANEJA and KARIM, and others, would and did conceal or minimize the role of both defendant SHOKOUHI and Company 1 in Abreezio's formation and development to avoid scrutiny from Victim Company's due diligence staff, in part because Victim Company had flagged conflict of interest

issues with defendant SHOKOUHI and Company 1 roughly a year earlier; for example, Company 1 would route its funding through Company 2 to obscure Company 1's involvement in Abreezio;

p.   It was a further part of the conspiracy that defendant SHEIDA would and did legally change her name from "Sheida Arabi" to "Sheida Alan" as part of the scheme in order to further mask her connection with defendant KARIM;

q.   It was a further part of the conspiracy that defendant KARIM would and did alter copies of patent documents to remove original references to "Sheida Arabi" and replace them with references to "Sheida Alan" following defendant SHEIDA's legal name change, all in an effort to further conceal defendant KARIM's connection to defendant SHEIDA and Abreezio;

r.   It was a further part of the conspiracy that defendant TANEJA would and did prepare backdated patent assignment documents to make it appear that defendant SHEIDA had signed them months earlier, and would and did provide signed, backdated documents to Victim Company;

s.   It was a further part of the conspiracy that defendants TANEJA, SHOKOUHI, and KARIM would and did coordinate responses to questions asked during Victim Company's due diligence inquiries to hide the role of defendant KARIM, defendant SHOKOUHI and Company 1 in Abreezio's formation, funding and development;

t.   It was a further part of the conspiracy that defendant SHEIDA would and did sign a notarized patent assignment agreement for the patent to Abreezio's core technology, knowing that she had no real connection to the technology being represented as her supposed invention;

u.   It was a further part of the conspiracy that defendants TANEJA, SHEIDA, and others would and did misrepresent to Victim Company in documents for its purchase of Abreezio that Abreezio was the sole and exclusive owner of its technology, and that everyone involved in the creation and development of Abreezio's intellectual property had been truthfully disclosed, all while knowing and concealing that defendant KARIM was intimately involved in that process, which would have allowed Victim Company to assert its own claim to Abreezio's intellectual property, had it known the truth;

v.   It was a further part of the conspiracy that defendants SHEIDA and KARIM would and did cause the preparation and submission of false and misleading discovery responses in civil litigation brought against them by Victim Company following the Abreezio sale; and

w.   It was a further part of the conspiracy that defendants KARIM and SHEIDA would and did prepare and cause to be prepared a falsified handwritten notebook purportedly documenting SHEIDA's contemporaneous research notes concerning DFT technology, and cause copies of the notebook to be produced in discovery in civil litigation brought by Victim Company.

17.   In further of this scheme, defendants KARIM, SHEIDA, TANEJA, SHOKOUHI, and QUINTON committed the following overt acts, among others:

a.   In the weeks preceding October 9, 2014, defendants KARIM and QUINTON exchanged emails arranging an in-person meeting in San Diego on that date; on or about October 10, 2014, defendant QUINTON sent himself an email, the entire body of which read "actions for Karim: cap table, basic coporate [sic] plan going forward. setup of [Holding Company] infastructure [sic][.]"

1        b.   On or about October 20, 2014, defendant QUINTON emailed

2 defendant KARIM to discuss their joint plan to use a dormant outside

3 company (the "Holding Company") to develop defendant KARIM's technology

4 and market it to "large semiconductor companies like [Victim Company]";

5 according to the email, part of the arrangement would involve making

6 defendant KARIM or one of his family members significant shareholders

7 in the Holding Company;

8        c.   On or about December 2, 2014, defendant QUINTON emailed

9 defendant KARIM to discuss the corporate structure of the Holding

10 Company; defendant QUINTON emphasized the need to think about "the

11 appearance of control from an investor/acquirer due diligence point of

12 view," adding that "[an] independent investor, with [] even a small

13 i[n]vestment, who could take a board role, would be very helpful" for

14 this purpose;

15        d.   On or about December 9, 2014, defendant KARIM emailed

16 defendant QUINTON and suggested Individual 1 for a board seat on the

17 Holding Company, adding that Individual 1 was supervising defendant

18 SHEIDA in her graduate studies; in response, defendant QUINTON cautioned

19 defendant KARIM against having defendant SHEIDA work on related

20 technology at University 1 because University 1 might try to assert

21 intellectual property rights in SHEIDA's work;

22        e.   On or about December 15, 2014, using a San Diego-based

23 IP address, defendant KARIM caused to be submitted an "Info Sheet" for

24 a provisional patent for technology related to the DFT field listing

25 "Sheida Arabi" as the purported sole inventor and main contact, but

26 bearing defendant KARIM's personal email address and defendant KARIM's

27 telephone number as defendant SHEIDA's contact information;

28

f.    On or about December 17, 2014, defendant KARIM created a Google email account ("sheida.arabi1@gmail.com") for the purpose of impersonating defendant SHEIDA (the "First SHEIDA Sham Account"); defendant KARIM created the First SHEIDA Sham Account from the same San Diego-based IP address that he had used to submit the "Info Sheet" for the provisional patent on December 15, 2014;

g.    In approximately December 2014, using one of her personal email accounts, defendant SHEIDA forwarded to defendant KARIM several emails associated with the provisional patent registration process, seeking defendant KARIM's guidance to facilitate the filings under defendant SHEIDA's name even though she had no real connection to the technology being patented as her supposed invention; in one email, defendant SHEIDA wrote to defendant KARIM, "What I need to send ??? I don not [sic] have any idea";

h.    On or about December 22, 2014, defendant KARIM caused to be filed a provisional patent application for DFT technology with the U.S. Patent and Trademark Office ("USPTO"); the application identified "Sheida Arabi" as the inventor, applicant, and filer, and provided the First SHEIDA Sham Account as defendant SHEIDA's supposed email contact;

i.    On or about December 28, 2014, defendant KARIM caused to be filed a second provisional patent application for related DFT technology to the USPTO, identifying "Sheida Arabi" as the inventor, and providing the First SHEIDA Sham Account as defendant SHEIDA's supposed email contact;

j.    On or about January 21, 2015, defendant KARIM emailed defendant QUINTON to inform him that defendant KARIM was close to finalizing an agreement with defendant TANEJA for defendant TANEJA to serve as CEO of the Holding Company;

11

1        k.   On or about January 23, 2015, defendant SHOKOUHI emailed
2   defendants KARIM and TANEJA to invite them and defendant QUINTON to an
3   operations meeting to discuss the formation and organization of the
4   Holding Company, including plans to engage with Victim Company (and
5   other customers); defendant KARIM replied to confirm the time for the
6   first telephone meeting, copying defendant QUINTON'S email address  at
7   defendant SHOKOUHI's request; defendant SHEIDA was not invited or even
8   copied on either message;

9        l.   On or about January 29, 2015, defendant KARIM emailed
10  defendants TANEJA, SHOKOUHI, and QUINTON to suggest a series of names
11  for the Holding Company, including Abreezio, which was eventually
12  selected; defendant SHEIDA was not copied;

13       m.   On or about February 3, 2015, after arranging to set up
14  Abreezio email accounts for himself, defendant SHOKOUHI, and defendant
15  QUINTON, defendant TANEJA texted defendant KARIM that he was "[a]ssuming
16  you will continue to use your Hotmail (better for O reasons)," clarifying
17  a moment later "O - optics";

18       n.   On or about February 3, 2015, defendant TANEJA arranged
19  to set up an Abreezio email account nominally for defendant SHEIDA
20  ("sheida@abreezio.com") (the "SHEIDA Abreezio Account") but sent the
21  activation instructions to the First SHEIDA Sham Account and texted
22  defendant KARIM to alert him that defendant TANEJA was setting up an
23  account "for your sister";

24       o.   Shortly thereafter, on or about February 3, 2015,
25  defendant KARIM texted defendant TANEJA "Just activated the google
26  account. It shows Verification in progress";

27       p.   On or about February 24, 2015, defendant TANEJA emailed
28  Individual 3, who was then a high-level employee at Victim Company and

1  was in fact defendant KARIM's former supervisor, to introduce Abreezio;

2  defendant TANEJA described Abreezio as "an angel-funded Silicon Valley

3  based design IP start-up" and requested a meeting to showcase its

4  "groundbreaking technology";

5       q.  On or about February 25, 2015, defendant TANEJA texted

6  defendant KARIM asking for help to prepare the "quantifiable benefit"

7  portion of Abreezio's presentation to Victim Company; specifically,

8  defendant TANEJA asked defendant KARIM for the "numbers" for the

9  comparable technology that Victim Company was then using, so that the

10  Abreezio team would know "the 'threshold' we need to cross at [Victim

11  Company]" which would "help us calibrate our positioning going in";

12      r.  On or about March 3, 2015, defendant KARIM provided

13  feedback on Abreezio marketing material circulated by defendant TANEJA,

14  using the First SHEIDA Sham Account;

15      s.  On or about March 4, 2015, defendants TANEJA and QUINTON

16  made a formal pitch on behalf of Abreezio to Victim Company staff;

17      t.  On or about March 11 and March 13, 2015, defendant TANEJA

18  emailed copies of Abreezio's operating agreement to the First SHEIDA

19  Sham Account and the SHEIDA Abreezio Account; on or about March 13,

20  2015, defendant TANEJA texted defendant KARIM "couple of updates in

21  Inbox. Thanks!";

22      u.  On or about March 12, 2015; September 21, 2015;

23  October 5, 2015; and October 13, 2015, defendant SHOKOUHI caused

24  Company 1 to provide hundreds of thousands of dollars of funding to

25  Abreezio, in each case funneling the money through Company 2 to obscure

26  its true source from Company 1;

27      v.  On or about March 20, 2015, defendant TANEJA made another

28  formal pitch on behalf of Abreezio to Victim Company staff, including

1   Individual 3 (KARIM's former supervisor); later that evening, defendant
2   TANEJA texted defendant KARIM "Thanks again to your technical prowess
3   'genius,' creative innovation and guidance, we made [a] great impression
4   yesterday!"; to keep up the false appearance that Abreezio's technology
5   was really invented by defendant SHEIDA, defendant KARIM responded,
6   "Thanks Sanjiv! I am quite proud of my sister and what she has
7   accomplished.";

8        w.  On or about April 16, 2015, defendant TANEJA sent
9   defendant QUINTON text messages stating in part "Confirmed with SA not
10  to share anything with [an employee of Victim Company]" and "please do
11  not mention Sheida's name"; QUINTON replied "Of course"; for at least
12  the preceding month, defendants TANEJA and QUINTON had exchanged emails
13  with "Sheida" knowing that, in truth, they were communicating with
14  defendant KARIM;

15       x.  On or about May 4, 2015, defendant QUINTON emailed
16  defendant TANEJA stating in part "I think you and I (and maybe Karim)
17  should have a discussion on [Victim Company] due diligence strategy
18  versus each of our roles after a potential acquisition. . . . Karim may
19  be able to give insight into what they will be looking for";

20       y.  On or about May 17, 2015, defendant QUINTON emailed
21  defendant TANEJA, stating in part: "1) We have put everything we have
22  done into being ready for [Victim Company] evaluation, and we are ready.
23  2) If [Victim Company] is not the customer then we have to re-think the
24  products. They have tailored [sic] specifically to [Victim Company's]
25  needs are re-actions [sic], not the general market. We have not done
26  *any* work outside of thinking about [Victim Company]";

27       z.  On or about May 27, 2015, defendant TANEJA emailed
28  defendant SHOKOUHI, defendant QUINTON, and the SHEIDA Abreezio Account

1   with subject "call-in number for our 5pm call" and dial-in information
2   for a conference call; the SHEIDA Abreezio Account replied "Will call
3   in a few minutes"; at 5:12 p.m., defendant KARIM called the dial-in
4   number listed in defendant TANEJA's email from defendant KARIM's
5   personal telephone number;

6          aa.  On or about July 15, 2015, defendant SHEIDA legally
7   changed her name from "Sheida Arabi" to "Sheida Alan" with British
8   Columbia authorities in Canada, in part to further enable Abreezio and
9   its principals to disguise from Victim Company any connection between
10  Abreezio and defendant KARIM;

11         bb.  On or about September 19, 2015, defendant KARIM created
12  a second Google account ("sheida.alan@gmail.com") for the purpose of
13  impersonating SHEIDA (the "Second SHEIDA Sham Account") and to avoid use
14  of SHEIDA's original surname "Arabi" in order to further distance
15  defendant KARIM from Abreezio; defendant KARIM created the Second SHEIDA
16  Sham Account from the same San Diego-based IP address that he had used
17  to create the First SHEIDA Sham Account on December 17, 2014, and to
18  submit the "Info Sheet" for the provisional patent on December 15, 2014;

19         cc.  On or about September 21, 2015, the Second SHEIDA Sham
20  Account emailed defendant TANEJA altered versions of the provisional
21  patent applications that defendant KARIM had submitted in December 2014,
22  which had been doctored to remove a reference to "Sheida Arabi" and
23  replace it with "Sheida Alan," and to remove the reference to the First
24  SHEIDA Sham Account and replace it with the Second SHEIDA Sham Account;

25         dd.  On or about September 23, 2015, defendant TANEJA emailed
26  defendant SHOKOUHI to suggest creating an Abreezio email account for
27  Individual 4, a key employee of Company 1 who had been providing
28  financial support to Abreezio; in order to continue to conceal

15

1  Company 1's role in Abreezio's development, defendant SHOKOUHI emailed
2  that "We can't use [Individual 4's] name since [Victim Company] knows
3  she works for [Company 1]. She talk[s] to [Victim Company] on regular
4  bas[i]s";

5        ee.  On or about September 24, 2015, defendant TANEJA emailed
6  the Second SHEIDA Sham Account to ask "Sheida" to sign a patent
7  assignment agreement which had been backdated to February 17, 2015, over
8  the name "Sheida Alan"; later that evening, the Second SHEIDA Sham
9  Account responded, attaching a backdated signed patent assignment
10 agreement bearing the signature "Sheida" (with no last name) over the
11 typed signature line "Sheida Alan";

12       ff.  On or about October 19, 2015, in response to a question
13 from Victim Company's due diligence staff about Company 2's ownership
14 and its connections to Abreezio's management or staff, defendant TANEJA
15 replied (after consultation with the Second SHEIDA Sham Account) that
16 Company 2 was "a bunch of private money including [an Abreezio board
17 member] and his friends from [other named companies]," assuring Victim
18 Company that there was no connection between Company 2 and any of
19 Abreezio's employees or management; in the email, defendant TANEJA did
20 not mention any connection between Company 2 and either defendant
21 SHOKOUHI or Company 1;

22       gg.  On or about October 26, 2015, defendant SHEIDA signed a
23 notarized patent assignment agreement concerning the Abreezio DFT
24 technology patents in Burnaby, British Columbia, Canada, using the name
25 "Sheida Alan";

26       hh.  On or about October 26, 2015, the Second SHEIDA Sham
27 Account sent a fictitious resumé for defendant SHEIDA to defendant
28 TANEJA, which contained numerous false statements about defendant

1  SHEIDA's qualifications, including invented work and academic history
2  both relevant to DFT technology; in the cover email for the fictitious
3  resumé, "Sheida" further stated that she had not signed any assignments
4  of intellectual property rights with University 1 as part of her graduate
5  work;

6      ii.  On or about October 30,2015, defendants TANEJA and SHEIDA
7  and others signed a Unit Purchase Agreement for Victim Company's purchase
8  of Abreezio, in which they falsely represented that they had made no
9  intentional misrepresentations in connection with the relevant patent
10  applications, and that Abreezio had not misrepresented or failed to
11  disclose any facts in any application that would constitute fraud or an
12  intentional misrepresentation with respect to such an application;
13  defendants TANEJA and SHEIDA and others also represented in the agreement
14  that they had truthfully disclosed everyone involved in the conception,
15  creation, and development of Abreezio's intellectual property, even
16  though nowhere in the process did anyone disclose defendant KARIM's
17  involvement;

18      jj.  On or about October 30, 2015, defendants KARIM, SHEIDA,
19  TANEJA, SHOKOUHI, and QUINTON caused Victim Company to issue a
20  combination of wire transfers totaling over $150 million (USD) to
21  themselves, their associates, and entities that they controlled, in
22  exchange for Victim Company's purchase of Abreezio;

23      kk.  On or about November 1, 2015, in a further effort to
24  create a fake paper trail substantiating defendant SHEIDA's involvement
25  in Abreezio, defendant TANEJA emailed the Second SHEIDA Sham Account,
26  thanking "Sheida" for her "breakthrough technology contributions" and
27  volunteering to "look you up if my future travels bring me to BC/Canada";

28

1           ll.  On or about January 16, 2018, as part of civil litigation

2  filed by Victim Company against defendants KARIM, SHEIDA, and TANEJA

3  arising out of the Abreezio purchase, defendant KARIM caused to be served

4  on counsel for Victim Company responses to interrogatories which

5  included, in response to the question "Describe your role in the

6  formation, operation, and sale of Abreezio LLC," the false and misleading

7  statements "Mr. Arabi introduced his sister Sheida Alan to his long-

8  time acquaintance Sanjiv Taneja, which introduction ultimately led to

9  the formation of Abreezio, LLC. However, Mr. Arabi otherwise had no role

10  in the formation, operation or sale of Abreezio, LLC."; and

11           mm.  On or about June 22, 2018, defendants KARIM and SHEIDA

12  caused to be produced in civil litigation a copy of a notebook supposedly

13  prepared by defendant SHEIDA and bearing internal dates from

14  September 17, 2012 to December 27, 2013, although in truth many of the

15  notes in the notebook were copied verbatim without attribution from

16  sources published long after the dates reflected in the notebook.

17  All in violation of Title 18, United States Code, Section 1349.

### Counts 2-5, 9
### Wire Fraud
### 18 U.S.C. §§ 1343 & 2

18.  Paragraphs 1 through 12 are hereby incorporated by reference as if fully stated herein.

19.  Beginning no later than October 2014, and continuing up to and including June 22, 2018, within the Southern District of California, and elsewhere, defendants KARIM ARABI ("KARIM"), SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA"), SANJIV TANEJA ("TANEJA"), ALI AKBAR SHOKOUHI ("SHOKOUHI"), and BRADLEY QUINTON ("QUINTON") did knowingly, with the intent to defraud, devise a material scheme and artifice to defraud and

for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and intentional concealment and omission of material facts.

20. As part of the scheme to defraud, defendants KARIM, SHEIDA, TANEJA, SHOKOUHI, and QUINTON utilized the Manner and Means described in paragraphs 14 through 16 above, which are hereby realleged and incorporated by reference as if fully stated herein.

**Execution of Scheme by Wire Communications**

21. On or about October 30, 2015, within the Southern District of California, and elsewhere, defendants KARIM ARABI ("KARIM"), SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA"), SANJIV TANEJA ("TANEJA"), ALI AKBAR SHOKOUHI ("SHOKOUHI"), and BRADLEY QUINTON ("QUINTON"), for the purpose of executing the aforesaid scheme and artifice to defraud, did transmit and cause to be transmitted by wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds  in the form of transfers of money as more particularly described below:

| Count | Defendant | Sending Bank | Recipient/ Receiving Bank | Approx. Amount (USD) |
|---|---|---|---|---|
| 2 | KARIM & SHEIDA | Bank of America | Canadian Imperial Bank of Commerce | $91,854,370.93 |
| 3 | SHOKOUHI | Bank of America | Bank of America Beneficiary: Company 2 | $14,352,245.46 |
| 4 | TANEJA | Bank of America | Bank of America | $10,046,571.82 |
| 5 | SHOKOUHI | Bank of America | Bank of America Beneficiary: Company 3 | $10,046,571.82 |

| 9 | QUINTON | Bank of America | Royal Bank of Canada Beneficiary: Company 4 | $19,313,006.28 |
|---|---------|-----------------|---------------------------------------------|-----------------|

All in violation of Title 18, United States Code, Sections 1343 and 2, and *Pinkerton v. United States,* 328 U.S. 640 (1946).

## Count 6
### Conspiracy to Launder Monetary Instruments
### 18 U.S.C. § 1956(h)
### [KARIM & SHEIDA]

22. Paragraphs 1 through 12 are hereby incorporated by reference as if fully stated herein.

23. Beginning on a date unknown to the grand jury but no later than August 21, 2015, and continuing up to and including at least April 1, 2021, within the Southern District of California, and elsewhere, defendants KARIM ARABI ("KARIM"), and SHEIDA ALAN, aka Sheida Arabi, ("SHEIDA"), did knowingly conspire together and with others known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

a. to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is, wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.   to knowingly engage and attempt to engage in monetary transactions, by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud; in violation of Title 18, United States Code, Section 1957.

24.  It was the purpose of the conspiracy for defendants KARIM and SHEIDA to launder the proceeds of wire fraud, and thereby enrich themselves and their associates.

25.  To accomplish the objectives of the conspiracy, defendants KARIM and SHEIDA used the following manner and means, among others:

a.   Defendant SHEIDA would and did open a dedicated bank account at Canadian Imperial Bank of Commerce ("CIBC") in the name "Sheida Alan" (the "Holding Account") to be used to receive over $91 million in wire fraud proceeds from Victim Company;

b.   Defendant SHEIDA would and did receive approximately $91,854,370.93 (USD) of wire fraud proceeds from Victim Company in the Holding Account;

c.   Within less than three months, defendant SHEIDA would and did empty the Holding Account by transferring its entire balance to another CIBC account and closing the Holding Account the same day;

d.   Defendant SHEIDA would and did form a Canadian real estate investment company, Avante North Ventures, Inc. ("Avante"), to further conceal and distribute the proceeds of wire fraud, including by investing them in valuable real estate in British Columbia;

e.   Defendant SHEIDA would and did transfer $4 million from Avante to a company controlled by defendant KARIM and later justify the

1  transfer as a business-to-business loan under a supposed promissory note
2  requiring no repayments for a period of up to five years;

3       f.   Defendant SHEIDA would and did coordinate with defendant
4  KARIM about the purchase, carrying, and disposition of real estate,
5  including by email;

6       g.   In consultation with defendant KARIM, defendant SHEIDA
7  would and did purchase multiple parcels of Canadian real estate worth
8  tens of millions of Canadian dollars;

9       h.   Defendant SHEIDA would and did transfer approximately
10 $12 million (USD) to Individual 5, who was a close family member related
11 to both her and KARIM, which Individual 5 then used to purchase multiple
12 parcels of additional real estate in a foreign country;

13      i.   In consultation with defendant KARIM, defendant SHEIDA
14 would and did liquidate certain pieces of real property, including
15 property purchased and held by Individual 5, to provide partial repayment
16 to Victim Company as part of defendants KARIM and SHEIDA's civil
17 settlement with Victim Company from a civil lawsuit Victim Company filed
18 against defendants KARIM and SHEIDA arising out of the Abreezio
19 transaction.

20 All in violation of Title 18, United States Code, Section 1956(h).

21                            **Count 7**
   **Engaging in Monetary Transactions in Property Derived From**
22                **Specified Unlawful Activity**
                        **18 U.S.C. § 1957**
23                         **[TANEJA]**

24    26.  Paragraphs 1 through 12 are hereby incorporated by reference
25 as if fully stated herein.

26    27.  On or about July 19, 2018, within the Southern District of
27 California, and elsewhere, defendant SANJIV TANEJA ("TANEJA"), did

28
                               22

knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, to wit: a wire transfer in the amount of $1,550,679.70 sent from Ally Bank account ending in x8694 to Ally Bank account ending in x4404, such property having been derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, in which defendant TANEJA participated in the transfer of the proceeds from the Southern District of California to another district.

All in violation of Title 18, United States Code, Section 1957.

### Count 8
### Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity
### 18 U.S.C. § 1957
### [SHOKOUHI]

28.   Paragraphs 1 through 12 are hereby incorporated by reference as if fully stated herein.

29.   On or about May 31, 2017, within the Southern District of California, defendant ALI AKBAR SHOKOUHI did knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00 and which was derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, to wit: a sale of 10,000 shares of stock (stock symbol LXRX) held by E*TRADE account ending in '0394 for $136,008.08.

All in violation of Title 18, United States Code, Section 1957.

1

## CRIMINAL FORFEITURE

2      30.  The  allegations  contained  in  Counts  1  through  9  of  this
3   Indictment  are  hereby  realleged  and  incorporated  by  reference  for  the
4   purpose  of  alleging  forfeiture  to  the  United  States  pursuant  to
5   Title  18,  United  States  Code,  Sections  981(a)(1)(C),  982(a)(1),  and
6   982(b),  and  Title  28,  United  States  Code,  Section  2461(c).

7      31.  Upon  conviction  of  one  and  more  of  the  offenses  in  violation
8   of  Title  18,  United  States  Code,  Sections  1349  and  1341  set  forth  in
9   Counts  1  through  5  and  9  of  this  Indictment,  defendants  KARIM  ARABI,
10   SHEIDA  ALAN,  aka  "Sheida  Arabi,"  SANJIV  TANEJA,  ALI  AKBAR  SHOKOUHI  and
11   BRADLEY  QUINTON  shall  forfeit  to  the  United  States  of  America,  pursuant
12   to  Title  18,  United  States  Code,  Section  981(a)(1)(C),  and  Title  28,
13   United  States  Code,  Section  2461(c),  all  property,  real  and  personal,
14   which  constitutes  or  is  derived  from  proceeds  of  the  offenses  and  all
15   property  traceable  to  such  property,  including  but  not  limited  to  the
16   specific  real  property  identified  in  paragraph  32.

17      32.  Upon  conviction  of  the  offense  in  violation  of  Title  18,  United
18   States  Code,  Section  1956(h)  as  set  forth  in  Count  6  defendants  KARIM
19   ARABI  and  SHEIDA  ALAN,  aka  Sheida  Arabi,  shall  forfeit  to  the  United
20   States  pursuant  to  Title  18,  United  States  Code,  Section  982(a)(1)  all
21   property  involved  in  the  offense.  The  property  to  be  forfeited  includes,
22   but  is  not  limited  to:

23          a.   real  property  located  at  1520  Vinson  Creek  Road,  West
24   Vancouver,  British  Columbia,  Canada  (008-505-152);

25          b.   real  property  located  at  Mosseveien  267,  1169  Oslo,
26   Norway  (cadastral  number  0301/194/188);

27

28

1          c.    real property located at Dyna Brygge 5, 0252 Oslo, Norway

2    (cadastral number 0301/210/58/0/11) including two associated parking

3    spaces (cadastral number 0301/510/16/0/58 and 0301/510/16/0/59);

4          d.    $284,805.64 in funds from Bank of America account number

5    ending x6028 held in the name of Atlazo, Inc. (Karim Arabi);

6          e.    $18,037.63 in funds from Bank of America account number

7    ending x7390 held in the name of Karim Arabi;

8          f.    All money received by Atlazo Inc. ("Atlazo") from Nordic

9    Semiconductor ASA ("Nordic") for the purchase of Atlazo's shares,

10   intellectual property, or other assets, which are designated for payment

11   to Karim Arabi, Abacus Machines LLC ("Abacus"), or to any party if

12   payment is based upon any promissory notes made payable to, or Atlazo

13   shares held by, Karim Arabi or Abacus, including any monies payable in

14   exchange for or based upon the following assets pursuant to Title 18,

15   United States Code, Sections 981(a)(1)(C), 982(a)(2)(B), and Title 21,

16   United States Code, Section 2461(c):

17              i.    Any stock in Atlazo held by Abacus, including

18   Series A-2, series A-3, or common stock;

19              ii.   Any stock in Atlazo held by Karim Arabi,

20   including Series A-2, Series A-3, or common stock;

21              iii.  Any promissory notes made payable to Karim

22   Arabi;

23              iv.   Any promissory notes made payable to Abacus;

24   and

25              v.    A cashier's check in the amount of $293,531.76

26   remitted to the United States Marshals Service by Atlazo, Inc.; and

27

28

                                    25

g.   $118,707.89 in funds from account number ending in 1860 held in the name of Karim Arabi at San Diego County Credit Union, San Diego, California.

33.   Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 as set forth in Count 7 defendant SANJIV TANEJA shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1) all property involved in the offense.

34.   Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 forth in Count 8 defendant ALI AKBAR SHOKOUHI shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1) all property involved in the offense.

35.   If any of the property described above, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party;

b.   has been placed beyond the jurisdiction of the court;

c.   has been substantially diminished in value; or

d.   has been commingled with other property that cannot be divided without difficulty,

//
//
//
//
//
//
//
//
//

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c). All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

DATED: April 4, 2024.



TARA K. McGRATH
United States Attorney

By: <u>NICHOLAS W. PILCHAK</u>
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys