GIBSON, DUNN & CRUTCHER LLP
NICOLA T. HANNA, SBN 130694
  NHanna@gibsondunn.com
JAMES N. ROTSTEIN, SBN 305072
  JRotstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

WINSTON Y. CHAN, SBN 214884
  WChan@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, California  94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Sanjiv Taneja*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI, SHEIDA ALAN, SANJIV TANEJA, AND ALI AKBAR SHOKOUHI,<br><br>Defendants. | CASE NO. 3:22-cr-01152-BAS<br><br>**DEFENDANT SANJIV TANEJA'S SENTENCING MEMORANDUM**<br><br>Date:    January 30, 2026<br>Time:    9:30 a.m.<br>Dept:    Courtroom 12B<br>Judge:   Honorable Cynthia Bashant |

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................ 2

II.   SANJIV TANEJA: THE PERSON ............................................................ 6

III.  THE OFFENSE AND PLEA AGREEMENT ........................................... 10

      A.    The Offense Conduct ..................................................................... 10

      B.    The Plea Agreement ....................................................................... 14

IV.   MR. TANEJA'S COOPERATION ............................................................ 15

V.    SENTENCING RECOMMENDATION ................................................... 16

      A.    The Guidelines ............................................................................... 17

      B.    § 3553(a) Factors ........................................................................... 18

            1.    Nature and Circumstances of the Offense ........................... 18

            2.    History and Characteristics of the Defendant ..................... 19

            3.    A Non-Custodial Sentence Promotes Respect For The Law
                  And Provides Just Punishment ............................................ 21

            4.    A Non-Custodial Sentence Affords Adequate Deterrence
                  And Protects The Public ...................................................... 21

            5.    Co-Defendant Sentences ..................................................... 22

      C.    Mr. Taneja's Sentencing Recommendation .................................... 23

VI.   CONCLUSION ........................................................................................ 26

Gibson, Dunn &
Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

Sanjiv Taneja has lived—and continues to live—a life of generosity, compassion, humility, hard work, and selflessness.  Those who know him best describe him as "the emotional anchor" of his family and "a pillar" of the community.  *See* Exhibits 5, 9.[1] Mr. Taneja is a quiet, deeply spiritual man and devout Hindu.  He attends religious services each week and, for decades, has given significant time and money to spiritual retreats, gatherings, and other charitable causes.  Mr. Taneja is also deeply devoted to his family and three children and has always made them feel "cherished."  *See* Ex. 2. Time and again, he has sacrificed his own sleep, sanity, and personal life to put his family and community first.  This is who Mr. Taneja is and this is how he should be defined.

Quite obviously, Mr. Taneja's conduct in this case is aberrational and not representative of his true character or his lifetime of achievements.  Mr. Taneja's involvement with Abreezio came at a low point in his life—he had worked for (in effect) one company for his entire 30-year career, until he was unexpectedly laid off in 2014. Being laid off at age 51 was psychologically devastating.  He struggled to find new employment and unsuccessfully tried to launch his own startup technology company. Thus, when Dr. Karim Arabi—a luminary in the semiconductor industry and V.P. of R&D at Qualcomm—came calling and offered him the opportunity of a lifetime to be CEO of Abreezio, he jumped at the chance.  But when Mr. Taneja agreed to join Abreezio, he had no knowledge of the scheme that had already been put in motion by Dr. Arabi, Sheida Alan, and Bradley Quinton.  It was only over time that Mr. Taneja began to uncover the truth.  While this in no way excuses his decision to continue working as Abreezio's CEO and engaging in the conduct that he did, it is contextually important to understand Mr. Taneja's involvement and relative culpability.  As the evidence establishes, Dr. Arabi was the instigator; he devised the scheme, he came up

---

[1] Exhibits 1–6 are affixed to Mr. Taneja's sentencing memorandum, and Exhibits 7–24 are affixed to Mr. Taneja's concurrently filed Motion for Leave to File Additional Letters in Support of his Sentencing Memorandum.

SANJIV TANEJA'S SENTENCING MEMORANDUM

with the technology, he recruited employees, he put his sister forward as the inventor, he solicited investors, he worked with Qualcomm insiders to sell the company, and he took the lion's share of the money. Indeed, the government's sentencing memorandum for Dr. Arabi describes him as the "mastermind" of the scheme and acknowledges that the co-defendants "testified consistently that Dr. Arabi guided practically every decision at Abreezio." *See* ECF No. 470 at 1, 3. And when Dr. Arabi needed a legitimate face for his company, he sought out Mr. Taneja, who he knew was down on his luck and had a deferential, non-confrontational nature.

Consistent with his core ethics, Mr. Taneja has fully accepted responsibility for his actions and does not—and has never—disputed the seriousness of the offense.[2] What most clearly demonstrates both that acceptance and the aberrational nature of his actions, however, are best demonstrated by his post-offense behavior, which is highly unique and bears little resemblance to the conduct of typical criminal defendants. Rather than engage in obstruction, ongoing concealment, or personal enrichment, Mr. Taneja consistently acted in a manner that facilitated Qualcomm's and the government's investigations and meaningfully mitigated the consequences of the offense.

**First**, in May 2017, Dr. Arabi met with Mr. Taneja and pressured him to delete incriminating communications that would undoubtedly reveal the underlying scheme. Although Mr. Taneja originally complied—while Dr. Arabi stood over his shoulder to make sure the emails were deleted—he later and independently decided to recover those messages and provide them to Qualcomm. It is very rare, if not unprecedented, that individuals with potential criminal exposure will intentionally preserve the very evidence of their own crimes and turn around and provide that evidence to the victim of the crime. But Mr. Taneja did this because he knew it was the right thing to do.

**Second**, throughout the course of this case, Mr. Taneja has repeatedly recognized his wrongdoing and gone above and beyond to help both Qualcomm and the

---

[2] Both the government and Probation agree that Mr. Taneja has fully accepted responsibility for his conduct.

SANJIV TANEJA'S SENTENCING MEMORANDUM

Gibson, Dunn & Crutcher LLP

government.  Mr. Taneja cooperated early with Qualcomm in connection with its civil lawsuit and provided it with all of the key materials and information that revealed—in no uncertain terms—the underlying conspiracy and scheme.[3]  He also cooperated early with the government and devoted hundreds of hours to assist the government in this prosecution and the investigation of others, including sitting for numerous multi-hour interviews, reviewing thousands of documents, and providing information not previously known.  At trial, he was a key government witness—testifying over the course of nearly three days—and his testimony helped secure the guilty verdict against Dr. Arabi.  Mr. Taneja was the first defendant to enter a guilty plea and engaged in early proffer sessions with the government, which likely led to Mr. Shokouhi's guilty plea shortly thereafter.  Mr. Taneja's information helped the government secure a superseding indictment against Bradley Quinton, and the government also relied on Mr. Taneja in connection with the Canadian extradition applications for Mr. Quinton and Ms. Alan.  Further, Mr. Taneja spent dozens of hours reviewing the government's expert reports and providing feedback.  Suffice it to say, Mr. Taneja played a critical—if not indispensable—role in the government's case.

**Finally**, although Mr. Taneja received approximately $10 million from the sale of Abreezio to Qualcomm, unlike most criminal defendants, Mr. Taneja never spent any of the ill-gotten gains.  He didn't make lavish purchases, and instead, maintained his unassuming and modest lifestyle.  Unlike Dr. Arabi, he didn't offshore the money.  Instead, he paid federal and state income tax on the money, and kept the rest in his bank

---

[3] At trial, Mr. Taneja testified that during his cooperation interview with Qualcomm in connection with the civil litigation, he minimized his own role.  Nevertheless, Mr. Taneja provided Qualcomm with the core facts of the criminal scheme as well as key, incriminating documents that enabled Qualcomm to resolve the dispute with the defendants—recovering approximately $47.2 million from Dr. Arabi and Ms. Alan— and ultimately refer the matter to the government for prosecution.  *See* ECF No. 451 ("PSR") ¶ 64.

savings and brokerage accounts in major U.S. banks and leading brokerage firms.[4]  Since Mr. Taneja kept the money, the government was able to recover the entire post-tax amount—a remarkable fact in a criminal fraud case that deviates dramatically from the conduct of a typical defendant.

In a situation where defendants often seek to obscure evidence and live the high life from their criminal deeds, Mr. Taneja stands in sharp contrast; indeed, his post-offense conduct provides the Court with a clear and reliable measure of accountability and character—particularly when viewed against his previously law-abiding and honorable life, the aberrational nature of this isolated lapse in judgment, and the government's own assessment that a non-custodial sentence is appropriate.[5]

Mr. Taneja is deeply remorseful and fully acknowledges that he committed a crime.  Indeed, William Suczek, Mr. Taneja's long-time friend, stated in his letter to this Court that Mr. Taneja has "deep and sincere remorse for his involvement" and "has not denied or evaded accountability."  *See* Ex. 22.  His choices have forever altered the course of his and his family's lives, and his professional reputation and financial stability have suffered a severe blow that will last the rest of his life.  But Mr. Taneja has taken

---

[4] The money laundering count to which Mr. Taneja pled involves him moving the money from one account in his name to another account in his name.  This was not a sophisticated effort to conceal or launder the funds.

[5] Probation's recommendation of 30-months custody uses an inflated loss amount that inappropriately increases the applicable guideline range and deviates from Mr. Taneja's plea agreement.  *See* ECF No. 511 (Mr. Taneja's Objections to the Presentence Report ("PSR")).  Deviating again from Mr. Taneja's plea agreement, Probation also does not apply a two-level downward departure under USSG § 5K2.0 for Mr. Taneja's early cooperation in Qualcomm's civil litigation and, instead, chooses to "defer[] to the Court for its possible application" because it "appears to be a part of plea negotiations."  ECF No. 451 ¶ 163.  Moreover, consistent with its local practice, Probation does not include any downward departure for Mr. Taneja's substantial assistance under USSG § 5K1.1.  Nevertheless, Probation still thought it was appropriate to vary downward nine levels given the facts and circumstances of this case.  Taking into account this significant downward variance, had Probation used the loss amount in the plea agreement or applied the 5K departures, it very likely would have been in the same Guideline range as Mr. Taneja and the government.

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

this as an opportunity to reflect and better himself.

For all the reasons herein, and for the reasons set forth in the government's sentencing memorandum, Mr. Taneja agrees with the government's recommendation for a non-custodial sentence, and respectfully requests that this Court impose a sentence of no more than time served (two days) and one year of supervised release, no fine, and no forfeiture or restitution beyond the $7,248,353.07 that has already been ordered forfeited by this Court. *See* ECF No. 496 ("Forfeiture Order").

## II.   SANJIV TANEJA: THE PERSON

Mr. Taneja is sixty-two years old and was born in Jhansi, India. He was raised in a house with his parents, siblings, and his uncle's family. His parents were loving, supportive, and worked incredibly hard to provide Mr. Taneja and his siblings with a good life and to instill strong values in their children. From a young age, he was taught the importance of compassion, selflessness, community, and spirituality—values still reflected in his life and his children's lives to this day.

As a high schooler, Mr. Taneja set his sights on a technical career. He studied relentlessly to receive top grades in school and, after scoring at the highest levels of the national entrance exam, was admitted to the prestigious and highly selective Indian Institute of Technology ("IIT") in New Delhi. IIT has historically had an acceptance rate of about 1%, which makes it one of the most competitive academic institutions in the world.[6] After graduating from IIT, Mr. Taneja moved to the United States to attend Ohio State University. He had received a full tuition waiver and teaching assistantship to complete a master's degree in computer science. Later, Mr. Taneja attended night classes while working full-time and received a Master of Business Administration from New York University.

Mr. Taneja married his wife, Simy Taneja, in 1989 and have three children, ages 31, 26, and 23. Two of their children—Ishan and Keshav—currently live at home

---

[6] *See Technology in Developing Economies*, STANFORD UNIVERSITY, https://tinyurl.com/mrp93xdh.

SANJIV TANEJA'S SENTENCING MEMORANDUM

Gibson, Dunn & Crutcher LLP

having recently completed their graduate degrees. Ishan (31) completed his PhD in computational drug discovery at Scripps Research in January 2026, Priyanka (26) is a software engineer at a technology company, and Keshav (23) completed his master's degree in computer engineering at University of California, Santa Barbara in December 2025. Understandably, this case has placed a significant amount of stress on Ms. Taneja and their three children. One of Mr. Taneja's close friends of over 40 years noted that this case has "affected their emotional well-being and required counseling for both [Mr. Taneja] and his wife" and that this has "been an incredibly difficult chapter for them all—emotionally, mentally, and financially." *See* Ex. 8.

All three of Mr. Taneja's children have submitted letters of support on behalf of their father. *See* Exs. 3 (Priyanka), 4 (Ishan and Keshav). These letters emphasize the type of father Mr. Taneja has been and continues to be. His children noted that Mr. Taneja always—no matter how busy he was—made time for them, their schooling, and their personal matters. His sons stated that while growing up, Mr. Taneja "modeled service in everyday ways" by always encouraging them to donate usable items and to not waste food, and by spending his own time supporting elders in the community and donating to charitable causes like educational foundations and scholarships. *See* Ex. 4. His daughter noted that at times his devotion to their family has been quiet, but impactful. For example, she explained how Mr. Taneja would drive her to school or her internship simply because it meant that she could sleep a little bit longer in the car. And Mr. Taneja would do this even if it meant rearranging his schedule or sacrificing his own sleep. *See* Ex. 3. He has been a remarkable father by all accounts—prioritizing his children and family and working to instill important values like service and sacrifice.

Outside of his family, Mr. Taneja's life is also marked significantly by his spirituality. Mr. Taneja is a devout Hindu who has been actively engaged in religious practice and community service for decades. He regularly attends several temples. For example, Mr. Taneja attends ISV Temple several times a week, has made monthly contributions for many years, and regularly assists with the distribution of free food on

Gibson, Dunn &
Crutcher LLP

Sundays. The Temple President of ISV noted that Mr. Taneja "has been an active and consistent presence in our ISV community—not only as a participant but also as a dependable servant leader. Over many years, he and his family have given their time, resources, and hearts to causes that matter deeply to us. Sanjiv is known for being quick to volunteer for manual services, from setting up chairs to cleaning up after gatherings. He does the needful without seeking recognition." *See* Ex. 22. A spiritual teacher at Chinmaya Mission—another temple Mr. Taneja attends—stated that Mr. Taneja demonstrates a deep "commitment to ethical living" and has selflessly dedicated his time to spiritual retreats and worked to improve access to the teachings of the Mission on YouTube and elsewhere. *See* Ex. 13. Mr. Taneja also regularly participates in 24-hour scripture readings. Indeed, Mr. Taneja's spirituality is so unwavering that one of his friends recalled that during an overseas vacation, Mr. Taneja left his friends and visited a local temple to ensure his spiritual routines were followed. *See* Ex. 17.

In addition, Mr. Taneja has a long-standing, demonstrated commitment to community service and generosity—both of his time and money. This commitment has only deepened since the start of this criminal case. Many family members and close friends noted in their letters to the Court that Mr. Taneja has a passion for helping elderly community members, whether that be by giving them rides to events, helping arrange doctor's appointments, or just calling to check in. *See e.g.*, Exs. 5, 10, 11. Since 2018, Mr. Taneja has also been extraordinarily involved with the cow sanctuary, Sri Surabhi Go Ksetra. In addition to volunteering approximately once a month, Mr. Taneja has also begun to offer additional assistance with emergency transportation of animals to the veterinary hospital. *See* Ex. 11. And during the COVID-19 pandemic, Mr. Taneja contributed to Ohio State University's medical relief fund and mobilized friends while coordinating with a U.S.-based initiative (VIPO Global) to send oxygen concentrators to his hometown in India.

Mr. Taneja also has a passion for serving educational causes. After Mr. Taneja's mother passed away in 2017, he sent dictionaries in her memory to an educational

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

nonprofit that serves children in rural India. Mr. Taneja has mentored high school students that wanted to pursue careers in STEM, and he also served as a high school debate competition judge in the Bay Area from 2009 to 2014. From 2018 to 2020, Mr. Taneja was an honorary advisor to University of California, Berkeley's Skydeck incubator for startup founders and made a generous financial donation to Berkeley. And from 2018 to 2022, Mr. Taneja was a mentor at Amrita University Technology Business Incubator in Kerala, India, which focuses on education and outreach to underserved populations.

Mr. Taneja's professional career is similarly remarkable. By all accounts, Mr. Taneja has always been a diligent and exceptional employee and engineer. Mr. Taneja is unique in that he gets deep personal satisfaction from the joy his work brings him—rather than any accolades or notoriety attached to his name. And countless letters of support submitted to this Court state that alongside his undeniable professional success and contributions, Mr. Taneja has always taken the time to mentor colleagues. *See e.g.*, Ex. 21.

His career is also unique in that it demonstrates deep loyalty to his employer. In 1985, after his graduation from OSU, Mr. Taneja was hired by AT&T Bell Laboratories (AT&T Bell Labs) as an engineer on the software side of chip design. After five years, he was promoted to manager and managed groups located in New Jersey and Pennsylvania. In 1998, Mr. Taneja's group at AT&T Bell Labs was acquired by a company called Cadence Design Systems, Inc. Mr. Taneja stayed with Cadence initially as a director of their product marketing team and was later promoted to Vice President in 2005.

In August 2014, after nearly 30 years with AT&T Bell Labs and then Cadence, there was a change in the executive management at Cadence and Mr. Taneja was laid off. He had been with AT&T Bell Labs and Cadence for his entire career and had no experience navigating unemployment. Mr. Taneja immediately began looking for new job opportunities. He also attempted to build a startup with a Stanford professor,

Subhasish Mitra, but the two were ultimately unsuccessful in finding sufficient investors. This was a very difficult, shameful, and hurtful time for Mr. Taneja. He had lived his entire life by working hard to achieve the American Dream. He had devoted his entire career to one company. But his loyalty was rewarded with a pink slip. His termination and inability to find a new job broke his confidence, embarrassed him socially, and he was at the lowest point in his life.

### III.   THE OFFENSE AND PLEA AGREEMENT

### A.   The Offense Conduct

Mr. Taneja provides the following background to supplement the presentence investigation report ("PSR") filed on September 18, 2025. *See* ECF No. 451 ("PSR"). Although Mr. Taneja takes full responsibility for his role in the sale of Abreezio to Qualcomm, it is important to understand the context of Mr. Taneja's involvement. Mr. Taneja was not a mastermind of this scheme. The scheme was initially devised by Dr. Arabi and Mr. Quinton in October 2014—well before Mr. Taneja accepted the CEO role. In fact, Mr. Taneja himself was repeatedly lied to by Dr. Arabi and others, and his understanding of the scheme evolved slowly over time. Instead, Mr. Taneja acted as, in the government's own words, a "shadow CEO"—essentially a puppet Dr. Arabi directed to carry out his scheme. *See Qualcomm Executive Convicted by Jury in $180 Million Fraud*, UNITED STATES ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF CALIFORNIA, PRESS RELEASE, https://tinyurl.com/2p6ms3mv (describing Mr. Taneja as a "shadow CEO").

Mr. Taneja first met Dr. Arabi in late 2005 during a sales visit while he still worked at Cadence. At the time, Mr. Taneja was leading the Design for Test ("DFT") group which developed software tools enabling semiconductor companies to design chips that are easily testable for manufacturing defects, thereby reducing test costs and improving product quality. DFT was Dr. Arabi's specialty, and in 2008, Dr. Arabi was hired to lead Qualcomm's DFT group. The two kept in touch through the end of Mr. Taneja's time at Cadence.

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

In early 2014, Mr. Taneja knew Cadence was struggling and anticipated executive management changes. He began looking for a new job. As part of a broader job search that included several semiconductor companies, Mr. Taneja applied for a position at Qualcomm and reached out to Dr. Arabi for help. This job ultimately did not pan out, but Dr. Arabi was highly respected in the industry and had many contacts. Mr. Taneja thought Dr. Arabi could be helpful to his job search.

In October 2014, Mr. Taneja met with Dr. Arabi concerning the (different) startup he was working on with Stanford Professor Dr. Mitra. Mr. Taneja pitched the startup and asked if Qualcomm was interested in providing funds or feedback, or if Dr. Arabi was interested in participating on the advisory board. It was during this meeting that Dr. Arabi vaguely mentioned a startup idea with a "Canadian company" in the DFT sector, but he did not provide specific details.

In December 2014, Mr. Taneja and Dr. Arabi met a handful of times to discuss Mr. Taneja's job search. Dr. Arabi again brought up the Canadian DFT startup. Dr. Arabi (in hindsight, falsely) told Mr. Taneja that the startup was founded by his sister, Sheida Arabi (Alan), who was a graduate student in Canada performing work under the supervision of a professor. Dr. Arabi described the technologies and mentioned that he might leave his job at Qualcomm to help his sister with the initial logistics of forming a company. At no point did Dr. Arabi indicate to Mr. Taneja that he was actually the inventor of this technology or founder of this company.

At the time, Mr. Taneja's impression of Dr. Arabi was that he was highly regarded in the industry—he was the Vice President of Research and Development at Qualcomm. Mr. Taneja trusted and respected him and had no indication in these early meetings there was the potential for fraud. To the contrary, Mr. Taneja was earnestly interested in the startup. He asked questions about the technology, Sheida's graduate advisor, and potential investors. He also reviewed the patents, which had already been filed in Sheida Arabi's name.

Dr. Arabi knew that Mr. Taneja was struggling and needed work, and Mr. Taneja

Gibson, Dunn & Crutcher LLP

11                                         3:22-cr-01152-BAS

SANJIV TANEJA'S SENTENCING MEMORANDUM

told Dr. Arabi he was interested in helping the startup. In January 2015, Dr. Arabi officially offered Mr. Taneja the CEO position. He was offered seven percent ownership in the company but no cash compensation until the startup received its first major round of funding. Mr. Taneja was thrilled to have a job offer after many months of hardship and unemployment. And Mr. Taneja was enthralled at the chance to build a new company and serve as CEO. Dr. Arabi knew this and likely took advantage of Mr. Taneja's desperation. He knew that Mr. Taneja was not in a position to negotiate the compensation package or perform his own thorough diligence of the startup prior to accepting the offer. And the delayed cash compensation ultimately tied Mr. Taneja's income to the success of the company, thus making it harder for Mr. Taneja to step away once he began to see the red flags. At the time, Mr. Taneja had a wife and three children ages 20, 15, and 12, all dependent on him for support.

When he accepted the CEO position, Mr. Taneja had no knowledge of the scheme to sell Abreezio to Qualcomm or Dr. Arabi's involvement in the invention of the technology, among many other material details. Over the initial few months, it became clear that Dr. Arabi wanted to direct every move Mr. Taneja made. For instance, in February 2015, Mr. Taneja met with Behrooz Abdi, who was then the CEO of Invensense, at a breakfast meeting that was arranged and also attended by Dr. Arabi. The purpose of the meeting was to discuss a potential investment in Abreezio. After the meeting, Mr. Abdi agreed to invest in Abreezio. In hindsight, Mr. Taneja now views this meeting as "an interview" for Dr. Arabi to see how Mr. Taneja would do as his "front man." A few months later, Dr. Arabi told Mr. Taneja to invite Mr. Abdi to join as chairman of the Abreezio board. There was a negotiation process between Mr. Taneja and Mr. Abdi regarding his compensation, but all of the negotiation guidance came from Dr. Arabi.

There were many times that Mr. Taneja asked if he could speak to the supposed founder of the startup and creator of the technology, Sheida Arabi (Alan). Dr. Arabi would make up lies to prevent this. Dr. Arabi told him Sheida was shy or that she was

only involved on the "technical side" and thus would not attend business operations meetings. He also told Mr. Taneja that it was too expensive for him to travel to Vancouver to meet her. Although "Sheida" had an Abreezio email address, Mr. Taneja did not know he was actually emailing Dr. Arabi until late February 2015, when Dr. Arabi spoke about "Sheida's" accounts. He was later told to address Dr. Arabi only as "Sheida" in writing. Around this same time, Mr. Taneja became suspicious that Dr. Arabi might be the actual inventor of the technology because he seemed to know a lot about the technical aspects of Abreezio's work.

Mr. Taneja knew that Dr. Arabi's involvement in Abreezio could pose a conflict-of-interest problem, but he also knew that sometimes exceptions were made. For example, while he was at Cadence, Mr. Taneja saw twice that Cadence employees, who were investors in other companies, brought those companies to Cadence and recused themselves from the due diligence process prior to Cadence's acquisition. Mr. Taneja told himself that there could be a similar process here.

Even though the red flags were mounting and Mr. Taneja understood certain facts were being concealed from Qualcomm, Mr. Taneja earnestly tried to build Abreezio and reach out to other investors and prospective customers. When Abreezio's discussions with Qualcomm slowed down in May 2015, Mr. Taneja focused on finding other customers to validate the technology and establish customer traction, which would support future venture investment to grow the company.

Mr. Taneja had struggled to get to this point and felt he had no other option except for Abreezio to be successful. It was this misguided willingness and desire to succeed that drove him to participate in various acts of concealment related to Dr. Arabi's involvement in Abreezio. Ultimately, the acquisition deal was finalized in October 2015, and Mr. Taneja made $10,046,571.82 from the sale. As part of the deal, he became a Qualcomm employee and stayed with the company until May 2016.

Although Mr. Taneja eventually was suspicious of Abreezio's activity, he did not, and likely still does not, know the full extent of the scheme. For example, Mr. Taneja

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

met with Ziad Mansour, a Qualcomm employee, in the spring of 2015.  Mr. Taneja initially thought Mr. Mansour was merely offering advice to Abreezio about its technology.  This was normal in the industry—companies like Qualcomm would often meet with vendors to give benchmarks or provide advice.  But it was not until Mr. Taneja reviewed the discovery from this case that he realized Mr. Mansour was aggressively championing the transaction from within Qualcomm.  And Mr. Taneja still does not know whether Mr. Mansour received any money from the deal, though Dr. Arabi told Mr. Taneja post-acquisition that he intended to make such payment.

## B.    The Plea Agreement

On July 19, 2022, the government filed an eight-count superseding indictment, charging Mr. Taneja with one count of wire fraud conspiracy in violation of 18 U.S.C. § 1349, one count of wire fraud in violation of 18 U.S.C. § 1343 and 2, and one count of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 and seeking forfeiture.  ECF No. 9.

On August 10, 2023, Mr. Taneja pled guilty to Count Seven, one violation of 18 U.S.C. § 1957, engaging in monetary transactions in property derived from specified unlawful activity in violation (here, wire fraud).  ECF No. 144.  The factual basis of this charge is that on July 19, 2018, Mr. Taneja wired $1,550,679.70 from one of his bank accounts to another bank account in his name, and this transaction was comprised of proceeds from the Abreezio sale.  *See id.* at 4.

In accordance with the terms of the plea agreement, the parties agreed to the following starting Offense Level calculations:[7]

---

[7] As noted in Mr. Taneja's objections to Probation's presentence report, Probation deviates from the Mr. Taneja's plea agreement and applies a 26-level increase pursuant to USSG § 2B1.1(b)(1)(N) based on an associated loss amount of $180 million.  *See* ECF No. 511 at 2.  If the Court ultimately agrees with Probation on the loss amount, Mr. Taneja respectfully requests the Court to vary downward accordingly as it is consistent with the factors enumerated in 18 U.S.C. 3553(a) as well as the Court's broad discretion in fashioning an appropriate, individualized sentence given the facts and circumstances of the case.  *See e.g., United States v. Jenkins*, 633 F.3d 788, 808–809 (9th Cir. 2011)

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

| | | | |
|---|---|---|---|
| 1. | Base Offense Level, §§ 2S1.1(a)(1) / 2B1.1(a)(2) | | +6 |
| 2. | Loss > $9.5 million, § 2B1.1(b)(1)(K) | | +20 |
| 3. | Violation of § 1957, § 2S1.1(b)(2)(A) | | +1 |
| 4. | Acceptance of Responsibility, §§ 3E1.1(a), (b) | | -3 |
| 5. | Combination of Circumstances, § 5K2.0 | | -2 |

**Total Offense Level: 22**

The Government also now seeks a ten-level substantial assistance departure pursuant to USSG, Section 5K1.1; a two-level deduction because Mr. Taneja is a Zero-Point Offender under USSG, Sections 4C1.1(a) and (b); and a two-level downward variance based on Section 3553(a) factors and the need to avoid unwanted sentencing disparities. Because Mr. Taneja has a Criminal History Category of I, Mr. Taneja is in "Zone A, " 0–6 months.

The government is recommending time served and three years of supervised release. Mr. Taneja agrees that time served is appropriate but respectfully suggests that one year of supervised release is sufficient in this case.

## IV.    MR. TANEJA'S COOPERATION

The details of Mr. Taneja's cooperation are set forth in the government's Substantial Assistance motion, but Mr. Taneja includes the key points here. Mr. Taneja was the first defendant to plead guilty, and he pled guilty relatively early in this case—he wanted to do the right thing. After he pled guilty, his cooperation was remarkably extensive and permanently altered the course of this case.

Mr. Taneja attended multiple proffer sessions with the government and provided a mountain of incriminating evidence previously unknown to the government. Mr. Taneja acted as a "de facto expert" for the government's case. He provided an extraordinary amount of information related to the technology at issue and reviewed and

(recognizing a district court's discretion with respect to fashioning sentences and determining loss amounts).

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

commented on the draft expert reports and expert rebuttal reports. In total, he provided *hundreds of hours* of technological and factual information that bolstered the government's case. He attended nearly half a dozen trial preparation sessions and testified truthfully and under rigorous cross-examination for three days at Dr. Arabi's trial, which ultimately ended in a conviction on all three counts. Moreover, he provided critical information to the government in connection with its extradition applications for Mr. Quinton and Ms. Alan. As the government notes, Mr. Taneja's cooperation helped lead to Mr. Shokouhi's guilty plea, Mr. Quinton's indictment, and Dr. Arabi's conviction.

The government appropriately recommends a ten-level downward departure under USSG, Section 5K1.1 for the substantial assistance Mr. Taneja provided. Mr. Taneja agrees and respectfully requests the Court apply this jointly recommended downward departure.

## V. SENTENCING RECOMMENDATION

The Sentencing Guidelines are not mandatory, and this court is authorized to impose a sentence below the Guideline range. *See United States v. Booker*, 543 U.S. 220, 224–225, 245 (2005); *United States v. Carty*, 520 F.3d 984, 990 (9th Cir. 2008) ("[T]he Guidelines are no longer mandatory but are only advisory."). Under *Booker* and its progeny, this Court must begin by determining the applicable Guidelines range. *Carty*, 520 F.3d at 991. The Court must then consider the factors set forth in 18 U.S.C. § 3553(a), including—(1) nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing ranges established in the Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims. *Id.*; *see also* 18 U.S.C. § 3553(a)(1)–(7).

The Ninth Circuit is clear that the Court may not presume the Guideline range is

reasonable, and the Guideline range is only one factor among the many § 3553(a) factors. *Carty*, 520 F.3d at 991. The Guidelines should not be given more or less weight than any other factor. *Id.*

After consideration of these factors, Mr. Taneja agrees with the government's non-custodial recommendation and respectfully requests the Court impose a sentence of time served and one year of supervised release. This sentence is "sufficient, but not greater than necessary" to promote deterrence, provide just punishment, and show respect for the law.

**A.      The Guidelines**

As outlined in Mr. Taneja's Sentencing Summary Chart and the government's Sentencing Summary Chart, Mr. Taneja and the government jointly recommend the Court calculate the Guidelines as follows:

**1.**      Base Offense Level, §§ 2S1.1(a)(1) / 2B1.1(a)(2)                              +6

**2.**      Loss > $9.5 million, § 2B1.1(b)(1)(K)                                        +20

**3.**      Violation of § 1957, § 2S1.1(b)(2)(A)                                        +1

**4.**      Acceptance of Responsibility, §§ 3E1.1(a), (b)                              -3

**5.**      Combination of Circumstances, § 5K2.0                                       -2

**6.**      Zero-Point Offender, §§ 4C1.1(a), (b)                                       -2

**7.**      Substantial Assistance, § 5K1.1                                            -10

**8.**      18 U.S.C. § 3553(a) (avoidance of sentencing disparities)                   -2

**Adjusted Offense Level: 8**

**Criminal History Category: I**

Accordingly, both the government and Mr. Taneja agree that that applicable Guideline range is 0–6 months. Mr. Taneja further agrees with the government and jointly recommends no custody. Mr. Taneja recommends one year of supervised release and believes it is sufficient but not greater than necessary.

**B.    § 3553(a) Factors**

**1.    Nature and Circumstances of the Offense**

The plea agreement, PSR, and this memorandum all describe the offense in detail, but Mr. Taneja wishes to highlight several important points that should weigh heavily in the Court's sentencing determination.

***First***, this was a nonviolent offense.  Although Mr. Taneja's conduct was serious, this case does not involve violence, death, threats, or injury.  The victim here was a large corporation that has been able to recover substantial amounts in the civil suit brought on its behalf and will recover substantial amounts from this action as well.  Indeed, Mr. Taneja kept all of the proceeds he received from the Abreezio sale, and it has now been forfeited to the government (minus the amount he paid in taxes).  Further, this is not a case in which Abreezio sold fake technology to Qualcomm—to the contrary, there was a tangible value to the DFT technology sold (along with the Abreezio team that went with it).

***Second***, Mr. Taneja was not the "mastermind" of this scheme.  Even the government has never accused him of such, and the PSR states, "[i]t is clear TANEJA was not the organizer or leader of this criminal activity, he acted on the direction of ARABI."  PSR ¶ 93.  Mr. Taneja joined Abreezio with no knowledge of the scheme and only uncovered the truth over time.

***Third***, Mr. Taneja was not motivated by greed.  Instead, Mr. Taneja agreed to be Abreezio's CEO when he was at the lowest point in his life and was struggling to find a job.  He needed to support his family, including his three children and their educational expenses.  Put bluntly—Mr. Taneja did not commit this crime to buy a yacht, a lavish house, or a private jet.  One of Mr. Taneja's friends wrote in her support letter to the Court that "he continues to live a life of simplicity and has never sought luxury or extravagance."  *See* Ex. 10.  Indeed, this is reinforced by the remarkable fact that Mr. Taneja simply invested the majority of the proceeds he received in his bank and brokerage accounts.  Moreover, he paid state and federal taxes on the money.  *See* Ex. 1

Gibson, Dunn &
Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

(Letter from Mr. Taneja's Tax Preparer).  Of course this does not excuse his behavior, but it is a relevant factor for this Court to consider.

## 2.     History and Characteristics of the Defendant

As discussed above, Mr. Taneja is a sixty-two-year-old man with a wife and three children.  Until this case, Mr. Taneja has been law abiding his entire life.  He has been under pretrial services' supervision for three years and has had no violations—even travelling to India twice (with government consent) after he pleaded guilty.  *See* PSR ¶ 174.  Close friends and family have described Mr. Taneja as a "pillar" of the community and have stated that his absence from the community, for any amount of time, would be a tremendous loss.  *See e.g.*, Ex. 9.

Mr. Taneja's extraordinary character is reflected ten-fold in the letters of support submitted to the Court on his behalf.  Those who have known him the longest unanimously emphasized that Mr. Taneja is deeply remorseful and has used this experience to deepen his commitment to service and positive values.

Dipesh H. Shah, a long-time friend of Mr. Taneja, wrote:

> When I first learned of the legal matter involving Mr. Taneja, I was astonished.  The allegations were entirely uncharacteristic of the man I knew.  From the very beginning, he was candid with me, openly sharing details of his situation.  Importantly, he did not attempt to evade responsibility.  Instead, he immediately acknowledged his mistake, admitted guilt, and fully cooperated with the prosecution.  His actions demonstrated a profound commitment to justice, even at great personal cost.
>
> I believe this response—his humility, honesty, and willingness to face the consequences—reflects his true character far more than the circumstances of his wrongdoing.  Neither he nor his family has ever been motivated by greed.  They never sought to retain any gains from this matter.  Rather, he has shown deep remorse and a genuine determination to never repeat such an error.

Brij Joshi, the husband of Mr. Taneja's niece, wrote:

> This shared spiritual foundation has allowed me to witness his profound remorse during these difficult years.  Our spiritual discussions have given me unique insight into his character—someone whose actions were completely contrary to his core values of honesty and integrity.  His anguish stems not just from legal

consequences, but from having violated the spiritual principles that define him. Through our conversations about accountability and moral conduct, I have observed his genuine commitment to rebuilding his life on the ethical foundation he abandoned.

His sons, Ishan and Keshav Taneja, wrote:

He acknowledged responsibility and cooperated fully with the authorities because he believed that was the morally right thing to do. Over the past three years, he has expressed genuine remorse while working to support our family through this period. …Since this incident, our dad has only deepened his longstanding commitment to his core values. Despite the stress of the pending legal situation and demands of his current job, he manages to find the time and energy to guide us as we navigate our own professional and personal challenges.

His niece, Purva Taneja, said:

I have observed sincere remorse—expressed not only in words but in prayer, reflection, and a visible change in his demeanor. He is clearly shaken. This situation is out of character for the person I have known all my life.… Despite this emotional toll, he continues to live out these values through service.… His quiet strength and steady service, even now, speak to the depth of his character.

Arun Kumar, a 40-year friend of Mr. Taneja, wrote:

I have witnessed deep self-reflection, where Sanjiv has measured his actions against his principles and recognized the moral lapse they represent. Our recent conversations have been candid, and I believe his remorse reflects not only the legal repercussions but also a deep acknowledgement that he acted contrary to the values that have guided his life.

And his daughter, Priyanka Taneja, said:

When the events that bring us here occurred, my dad immediately sat our family down and, with honesty and remorse, explained everything without excuses.… Through candid conversations, my dad has consistently focused on my mother, my brothers, and me, acknowledging how his actions affected us and working to make amends.

In his presentence interview, Mr. Taneja expressed "deep remorse for his participation" and stated he "fully understands the crime he committed" and that it was a "huge mistake." PSR ¶ 82. Mr. Taneja feels so much shame in connection with his

conduct, in part, because his conduct stands in stark contrast to the type of person he is and the values he holds.  He has used this time to renew his commitment to the type of life he wants to lead—one of integrity.

### 3.    A Non-Custodial Sentence Promotes Respect For The Law And Provides Just Punishment

A non-custodial sentence would not mean that Mr. Taneja's actions go without consequence.  To the contrary, this legal case has taken a tremendous toll on Mr. Taneja and his family, and will continue to impose immense financial strain and shame on them.  Mr. Taneja's wife in particular is suffering from significant stress and has had medical issues since the start of this case.

This case has also taken a toll on Mr. Taneja's professional reputation.  Following the indictment, Mr. Taneja faced a long period of unemployment despite his diligent efforts to find work.  Given the notoriety of this case, it was not until June 2024 that Naveen Kumar at Nityo Infotech gave Mr. Taneja a chance to get back on his feet.  He has worked hard to rehabilitate his reputation and is now the senior vice president of engineering and innovation at Nityo Infotech.  This is a monumental and meaningful step towards rehabilitation.  Mr. Taneja's boss, Naveen Kumar, noted in his letter to the Court that Mr. Taneja has performed extraordinarily well since the start of his employment.  *See* Ex. 16.  Mr. Kumar stated that Mr. Taneja has been "candid with the existing as well as prospective clients about this case" and that "most clients appreciate his honesty and continue to move forward." *Id.*  Any custodial sentence would adversely impact his employment, including the fact that his salary is entirely commission based and a custodial sentence would prevent him from earning commission and supporting his family.

A non-custodial sentence would mean that Mr. Taneja is able to maintain his employment, support his family, and meaningfully contribute to the community.

### 4.    A Non-Custodial Sentence Affords Adequate Deterrence And Protects The Public

Gibson, Dunn & Crutcher LLP

Mr. Taneja presents no risk of recidivism whatsoever. Mr. Taneja has no criminal history aside from this case and has done extraordinarily well while on pretrial supervision. Probation stated that it has "no doubt that TANEJA will return to a law-abiding life." PSR ¶ 175. The government similarly agrees.

And, although this offense is serious, Mr. Taneja never put the public in harm's way. This was not a violent crime. And this was not a crime that involved defrauding individuals of their life savings. Mr. Taneja currently poses no threat to the public—quite the opposite. In the words of Mr. Taneja's long-time friend Dipesh Shah, Mr. Taneja's "continued presence among us will bring far greater good than his absence." Ex. 15. Mr. Taneja is deeply committed to his spiritual values of peace, generosity, and selflessness. He stated in his presentence interview that his goals after sentencing are to "never deviate[] from the values he was grounded in," "have a character reformation," "work hard to build a source of financial livelihood for himself and his family," "bring happiness to his family," and "continue serving his community by sharing experiences so others can learn a lesson from his mistakes." PSR ¶ 118.

### 5.    Co-Defendant Sentences

18 U.S.C. § 3553(a)(6) states that a court must consider the "need to avoid unwarranted sentencing disparities." On October 28, 2025, this Court sentenced Dr. Arabi to 48 months imprisonment. *See* ECF Nos. 487, 489. There can be no question that Dr. Arabi is the most culpable (and least cooperative) of all co-defendants. Dr. Arabi is the mastermind of the scheme and along with Sheida, received over $91 million from the sale of Abreezio.

On the other hand, Mr. Taneja is the least culpable—and most cooperative—of all indicted co-defendants, and his sentence should reflect this. The government itself has acknowledged that Mr. Taneja was simply the "front man" for Dr. Arabi. And the facts show that Mr. Taneja mostly operated at Dr. Arabi's direction throughout the course of the scheme. In addition, out of all the indicted co-defendants, Mr. Taneja made the least amount of money from the scheme. Dr. Arabi received over $91 million, Mr.

Shokouhi, through his company TechVC, received over $24 million, Invionics Inc. (Mr. Quinton's company) received over $19 million, and Mr. Taneja made approximately $10 million. *See* PSR ¶ 43. All of the money he received from the sale has now been recovered with the exception of the income taxes he paid. *See* Ex. 1.

Thus, Mr. Taneja's sentence should be significantly lower than Dr. Arabi's, and a non-custodial sentence of probation is appropriate in this context.

## C.    Mr. Taneja's Sentencing Recommendation

***Sentence***. Mr. Taneja agrees with the government's recommendation of time served. He separately recommends one year of supervised release.

***Forfeiture***. On November 6, 2025, this Court entered a forfeiture order in the amount of $7,248,353.07. *See* ECF No. 496. No additional forfeiture should be ordered beyond this amount, because Mr. Taneja is not in possession of any additional funds that derive from the criminal activity. Although Mr. Taneja received $10,046,571.82 from Qualcomm as his share of Abreezio's purchase price, he paid $2,039,722 in federal income taxes and $1,333,737 in state income taxes on this amount. *See* Ex. 1. The government also has not sought any additional forfeiture. Thus, the forfeiture amount should be capped at the amount referenced in the Court's November 2025 forfeiture order. The Clerk of Court is currently in possession of these funds.

***Restitution***. Restitution beyond the already forfeited amount is not appropriate or warranted in this case as it pertains to Mr. Taneja. The financial addendum to Mr. Taneja's plea agreement states that, provided Mr. Taneja does not breach the plea agreement (he has not) and the seized assets are transferred to the Clerk of Court (they were), "then the amount of net proceeds from the seized assets will be credited against any personal money judgment imposed." *See* ECF No. 144-1 at A.ii (Financial Addendum). So, any restitution order must be credited by the net value of the seized assets, or $7,248,353.07. Mr. Taneja should not be ordered to pay anything beyond the forfeited amount because as stated, although Mr. Taneja received $10,046,571.82 from the sale of Abreezio, he paid the remainder in taxes. *See* Ex. 1. Ordering restitution

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

beyond the forfeited amount would thus, in essence, penalize Mr. Taneja for paying taxes. He would be forced to pay millions of dollars beyond what he actually retains from the transaction.

Even further, the victim in this case, Qualcomm, has not specifically requested restitution from Mr. Taneja and has not filed a victim impact statement in this proceeding. To the contrary, Mr. Taneja and Qualcomm entered into a settlement agreement in January 2018 to resolve the civil litigation, which was predicated on the very same facts as this criminal case. In exchange for Mr. Taneja's substantial and extensive cooperation throughout the civil investigation and litigation, Qualcomm expressly agreed not to collect from Mr. Taneja any money he personally received from the Abreezio transaction. Mr. Taneja also agreed to assign Qualcomm his insurance rights. This means Qualcomm is permitted to receive insurance reimbursements under the applicable insurance policies.[8]  No other defendant has this agreement with Qualcomm. Neither Qualcomm nor Mr. Taneja has ever claimed this settlement agreement is ineffective or has been breached. And importantly, Qualcomm has never requested Mr. Taneja repay any funds, and Mr. Taneja has never been ordered to pay any money to Qualcomm.

Thus, ordering any restitution beyond the already forfeited amount would vitiate the terms of the settlement agreement between Mr. Taneja and Qualcomm. Restitution is intended to make victims whole, but the victim here, Qualcomm, has **expressly agreed** to **not collect any money** from Mr. Taneja and has been reimbursed in other ways (cooperation in the civil case and assignment of insurance rights). Admittedly, this is a relatively unusual situation—and only applies to Mr. Taneja in this case (no other co-

---

[8] The settlement agreement between Mr. Taneja and Qualcomm is confidential. *See e.g.*, ECF No. 109-2 (redacted Declaration of Brian M. Lutz identifying key terms of settlement agreement). To the extent the Court would like to review the settlement agreement *in camera*, counsel for Mr. Taneja will have hard copies of the agreement at the January 30, 2026 sentencing hearing. However, the parties do not dispute the existence of the settlement agreement or the relevant terms.

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

defendant had a similar agreement)—but the Court should factor in the terms of this settlement agreement to any sentence imposed and find further restitution is not appropriate here.

Further, the government agrees that Mr. Taneja's restitution should be capped at the amount he received from the transaction and that joint-and-several liability of Qualcomm's entire purchase price of Abreezio is not appropriate in this case. *But see* ECF No. 490 (ordering joint-and-several liability as to restitution amount). It would be patently unfair to financially cripple Mr. Taneja by not issuing a cap on his restitution, and instead, make him responsible—on a joint and several basis—for monies he never received. This is particularly true in light of the fact that Mr. Taneja retained the proceeds he received from the Abreezio transaction, while others went through great lengths to hide their much larger portions through, among other things, offshore bank accounts and international real estate purchases.

Finally, if this Court ultimately concludes that restitution is appropriate beyond the forfeited amount, Mr. Taneja requests the Court impose a monthly payment of no more than $400 per month. Mr. Taneja stands before the Court financially ruined. He has significant debt (*see e.g.*, PSR ¶ 144) and his professional reputation has been shattered. Mr. Taneja's current job is entirely commission based (*see* PSR ¶ 135) and thus his income fluctuates significantly. He does not receive a set yearly salary and so there will inevitably be many months in which Mr. Taneja earns very little, or even no money. The monthly payment amount recommended by Probation does not take this into account and also does not take into account unanticipated expenses such as healthcare costs or home and car repairs. If this Court imposes restitution, Mr. Taneja requests that the Court cap monthly payments at $400 per month.

***Fine***. Mr. Taneja requests that no fine be imposed. The government and Probation also recommend no fine be imposed.

***$100 mandatory special assessment***. Mr. Taneja does not dispute that there is a $100 mandatory special assessment.

***Supervised release***.  As noted above, Mr. Taneja requests one year of supervised release.  He has had no violations on pretrial release and poses no threat to the public or risk of recidivism.

## VI.    CONCLUSION

For the reasons stated above, Mr. Taneja respectfully requests that this Court impose a non-custodial sentence of time served and one year of supervised release, no fine, and no forfeiture or restitution beyond the $7,248,353.07 that has already been ordered forfeited by this Court.

DATED: January 23, 2026                    Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By:  */s/ Nicola T. Hanna*
       Nicola T. Hanna
       Winston Y. Chan
       James N. Rotstein

       *Attorneys for Sanjiv Taneja*

Gibson, Dunn & Crutcher LLP

SANJIV TANEJA'S SENTENCING MEMORANDUM

## INDEX OF EXHIBITS

| Description | Exhibit Number |
|---|---|
| Letter from Mr. Taneja's CPA, Ramesh Patel | 1 |
| Letter of Support from Simy Taneja | 2 |
| Letter of Support from Priyanka Taneja | 3 |
| Letter of Support from Ishan and Keshav Taneja | 4 |
| Letter of Support from Purva Taneja | 5 |
| Letter of Support from Sunil Taneja | 6 |